## JOHN DOUBLEHEAD v. STATE.

No. A-4540.     Opinion Filed Aug. 25, 1924.
(228 Pac. 170.)

(Syllabus.)

1. **Appeal and Error—Discretion of Trial Court—Change of Venue.** Applications for a change of venue are addressed to the discretion of the trial court. Before a judgment of conviction will be set aside in the appellate court because the trial court . overruled the motion for a change of venue, there must be shown by the appellant a clear abuse of discretion on the part of the trial court.

2. **Evidence—Admissibility of Confessions—Discretion of Court.** In deciding whether a confession is admissible in evidence, the trial court is necessarily vested with a large discretion. However, this discretion should be exercised with great care, looking to the due and proper enforcement of the law on the one hand and to the protection of the defendant on the other, in order that no injustice may be done him.

3. **Same—Confession Held Admissible.** Evidence on the question of the admissibility of defendant's confession considered and the conclusion reached that the same was properly admitted; that there was not such a showing that the same was extorted from the defendant by threats of violence to him or other evidence of fear of violence on his part as to render its admission a clear abuse of discretion on the part of the trial court. The method employed by the officers in procuring a confession from the defendant is, however, criticized.

4. **Homicide—Evidence Insufficient to Sustain Plea of Insanity.** Evidence on the question of defendant's insanity examined, and it is held that there was no evidence of insanity such as to render the defendant criminally irresponsible within the meaning of section 1511, Compiled Statutes 1921.

5.    **Homicide—Remarks of Prosecuting Counsel Prejudicial—Reduction of Sentence to Life Imprisonment.** Certain remarks made by counsel for the state in the closing argument to the jury examined, and held, that the same tended to operate to incite the jury, because of passion and prejudice, to inflict the death penalty instead of imprisonment for life at hard labor on matters not based on evidence in the case. This error in connection with circumstances surrounding the obtaining of the confession from the defendant is considered sufficiently prejudicial to require a modification of the judgment from that of death to imprisonment for life at hard labor.

Appeal from District Court, Adair County; J. H. Jarman, Judge.

John Doublehead was convicted of murder, and he appeals. Modified and affirmed.

Plaintiff in error, John Doublehead, hereinafter referred to as defendant, was by judgment of the district court of Adair county rendered on the 19th day of December, 1922, convicted of the crime of murder and sentenced to be electrocuted on the 20th day of February, 1923. Within the time prescribed by law, an appeal was taken to this court and the judgment was stayed pending the determination of this appeal.

The defendant is a full-blood Cherokee Indian. The deceased, James Davenport (familiarly called Uncle Jimmie), was a native of the state of Alabama, possessing no Indian blood and above 60 years of age. Davenport was small of stature, weighed about 130 pounds, and lived by himself on a farm 4 or 5 miles southwest of the town of Stillwell in Adair county. The defendant owned an allotment of land about a mile from where the deceased lived, and for some time prior to the commission of this homicide had been living part of the time on his allotment. Part of the time, however, the defendant stayed in the town of Stillwell. The deceased lived by himself and was possessed of four head of horses, some poultry, and various farming implements.

It appears that two head of the horses of the deceased were of considerable value and that the defendant for some time had been endeavoring to obtain the same from the deceased. It also appears that the deceased was in the habit, on mornings and evenings, of going to a field near his place to feed some stock and in so doing he had to pass close to a neighbor's house. The homicide was committed on Friday evening September 8, 1922. On the next day neighbors, who were Indians, noticed that Davenport failed to show up to feed his stock. This circumstance aroused their suspicion, and three of the neighbor boys went over to Davenport's place to see if he was at home. They noticed the horses were gone, but that the chickens and dogs were still there. They did not go into the house, but as it had been rumored that Davenport had been sick they notified a deputy sheriff that Davenport had not been seen for a day or two, but in the meantime they continued to search for him. Davenport was not found at home, and the further search made by them did not result in his discovery.

On the Saturday morning immediately following the commission of the homicide the defendant was seen riding one of the deceased's horses and leading another about two miles south of the town of Stillwell, going towards Stillwell. On the Monday following the killing a party was organized to search for Davenport. While a number of this party were sitting in the shade of a tree at the ford of a creek near the defendant's home, the defendant came down riding from towards his home with two of the horses of the deceased and stopped to water the horses in the creek. One member of this party approached the defendant and asked him where he got the horses, and defendant told him that he had bought the horses from Uncle Jim Davenport and had paid $275 for them and had agreed to take up a note at the First National Bank for

$30, due October 1st; that his deal with the deceased included the entire equipment that the deceased had at his place, including three horses, wagon, chickens, and household goods, but that the deceased had retained one of his horses to ride to Alabama on. As soon as the defendant had told this story he was taken into custody by the party and held for the sheriff. Later he was turned over to the sheriff. Later the horse that Davenport was supposed to have ridden to Alabama was found. On the next day (Tuesday) a larger party was organized to search for Davenport, and his body was found 66 steps north from the porch of the house on the farm of the defendant. The body was buried about 14 inches below the level of the ground. There was an undershirt and a pair of overalls on the body, and a gunny sack spread lengthwise from the head to the waist, and something similar to a sugar sack wrapped around his feet, with a bed blanket underneath the body. It had been buried face downward and the hat of the deceased was placed directly underneath his face.

On Sunday September 17, 1922, after defendant had been in jail for nearly a week he was taken from the jail, and accompanied by a deputy sheriff, the county attorney, and the city marshal of Stillwell, he was placed in an automobile, handcuffed, and then driven to the defendant's home southwest of Stillwell. The deputy sheriff and the city marshal were armed, one with a rifle and the other with a shotgun. So far as the record discloses the county attorney was unarmed. The defendant was placed in the front seat of the car with one of the armed officers. Another officer by the name of Johnson, a constable, followed in another two-seated car. It appears that when these officers had reached the ford of a creek between Stillwell and the farm of the defendant they were met by appointment by four men, who lived in that neighborhood. These men got in the car with

Johnson. Defendant was taken to his home and there told to point out the grave in which he had buried the deceased. He led the party to the place where Davenport had been buried. The county attorney then asked the defendant if that were not the grave. The defendant never replied, and the county attorney again asked, "Is this the grave?" and the defendant said, "It is." The county attorney then asked, "What did you do that for—his team?" and the defendant said, "Yes." Defendant was then asked what he did with the saddle belonging to the deceased, and he said it is "out yonder." Defendant was then asked what he did with his shoes, and he said, "I don't know." Defendant was then told if he was going to come clean to tell the whole truth, that he did know where the shoes were, and that the saddle and the shoes would be found, and he then said, "They are over yonder." The defendant was then asked to "lead us to the saddle." Defendant then turned back to the house about 70 yards and then went east about that distance and said, "There it is," pointing to a fence corner. The saddle was found, and the defendant then led the party to where the shoes were hid, approximately a mile and half from where they then were and in a roundabout way. The shoes were hid under some bushes. Defendant was then taken over to the house where the deceased had lived, and one of the witnesses detailed the statements made by the defendant at the house as follows:

"A. Do you want to know what was done right at the house? Q. Yes. A. We went up at the gate, and Mr. Grant asked him where he killed him, and he said, 'Right here at the gate.' Q. Go ahead and tell how he said he killed him, if he did. A. He said when he went up there that Uncle Jimmie was dogging a hog and wasn't at his house and in just a few minutes he come around the house and began to talk to him, and he come out to the gate, and he said, 'We didn't talk much until I saw this club laying in the yard,'

and he said he kinder turned around and I hit him on the side of the head and knocked him down, and he said he hit him one lick on the back of the head on the ground with the club. Q. Then what, if anything, did he say he did? A. He said he threw the club away. Q. Did he find the club for you? A. He hunted, and we all hunted, in the direction he said he threw the club and we found a club that he said was about the size and about the weight, but it seemed too short. He said it 'seemed to me it was about that long.' And he held his hands out 8 or 10 inches longer than the club. He would pick it up and look at it and he said it looked too short. Q. What if anything did he say that he then did? A. He said the next thing he did was to put Uncle Jimmie's saddle on his horse. Q. Did he say whether he was riding bare-back? A. Yes; he said he was riding bare-back. Q. What else? A. He said the next thing he did was to go in the house and get some blankets and old sacks and wrap him up and put him on the horse and he got on behind and carried him to where he buried him and laid him down in some weeds and bushes close to the spring branch. Then he said he went and got a shovel and a hoe and he dug the grave and put him in it, turned his horse loose and taken the saddle off of his horse at the grave and turned the horse loose, and he taken him up and unsaddled his horse and taken the saddle and threw it over the fence and went up to his mother's. Went to bed, and went to sleep, and he said he slept until about 7 o'clock the next morning. And I told him that at 7 o'clock the sun was up and he said the sun was a shining when he got up, and he said he got his breakfast, went back afoot and cut Uncle Jimmie's horses loose and picked up Uncle Jimmie's shoes and led them the way he led us and hid the shoes and come on home and tied up his horses and went back to—up to Sam Doublehead's and borrowed a pair of doubletrees and a single tree and come back and harnessed the horses, hitched to the plow and plowed this land, plowing around the grave, and unhitched and unharnessed and got on his pony and led the other two horses and come to town and put them in the wagon yard.''

The circumstances above detailed, together with the confession made by the defendant was the evidence upon which the state secured a conviction.

Under the plea of not guilty, counsel for the defendant introduced witnesses in an attempt to prove that at the time of the commission of the offense the defendant was insane. This evidence consisted of the testimony of one Dr. H. C. Dorsey, a specialist in the treatment of nervous diseases and of insanity, who a few days before the trial made a cursory examination of the defendant in the jail at Stillwell and found some evidence that the defendant had been a drinker of intoxicating liquor and that a trace of syphilis was found in the blood of the defendant; but witness, from the examination made, did not testify that the defendant was insane but testified that he found symptoms of conditions in the defendant that ofttimes were causes of insanity.

In addition to the testimony of this alienist, it is disclosed by the record that the defendant served in the army of the United States overseas in the late war, and that he was gassed in action and there is testimony by the defendant's mother to the effect that the maternal grandfather of the defendant was not right mentally at the time of his death.

In rebuttal the state introduced several lay witnesses, who testified from their acquaintance and observation of the defendant to certain facts and circumstances upon which their opinions were based and conclusions reached that the defendant was sane.

The trial court's instructions are a model set, fully covering every phase of the law presented by the issues raised and no objection is urged to any paragraph of the instructions or to the instructions as a whole.

The defendant made application for a change of venue from Adair county. After hearing evidence in support of and in opposition of this application the same was overruled, and the action of the trial court in overruling the motion was properly excepted to at the time.

Counsel for the defendant also moved for a continuance on account of the absence of one H. C. Dorsey, a material witness in his behalf, but as this witness was afterwards produced and testified at the trial for the defendant no error is assigned because of the denial of the continuance of the trial.

When the state offered testimony relative to the purported confession of the defendant, counsel for the defendant objected thereto upon the grounds that the same was not a voluntary confession but was obtained by reason of implied threats of personal violence to the defendant. In the absence of the jury, the trial court heard testimony, pro and con, as to whether the confession of the defendant was or was not voluntarily given, and, upon the evidence adduced by both sides, ruled that the confession was voluntary and admissible against the defendant. To this action of the trial court the defendant, at the time, objected and saved his exception. Thereafter evidence of the purported confession, together with its surrounding circumstances was permitted to go to the jury.

In addition to the foregoing alleged errors, it is contended generally that the evidence is not sufficient to sustain the conviction, and further, that certain incompetent evidence was admitted against the defendant during the progress of the trial.

Certain alleged remarks by counsel for the state in the argument to the jury, which were objected to, are alleged

to have been sufficiently prejudicial to require a reversal of this judgment.

The foregoing statement contains substantially an outline of the issues presented and of the exceptions reserved during the progress of the trial and here relied upon. These alleged errors will be treated in the body of the opinion.

John A. Goodall, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). The first ground for reversal urged is that the trial court erred to the prejudice of the defendant in denying the application for a change of venue from Adair county. The motion for a change of venue is based on the existence of prejudice in Adair county against the defendant "by such citizens as usually compose juries of the district court of Adair county"; that the defendant has considerable acquaintance with the citizens of Adair county, that such prejudice is without any just cause and prevails throughout the county, and that a fair and impartial trial by jury cannot be had by the said defendant in said county.

In support of the motion, which was verified, there was attached the affidavit of John A. Goodall, attorney for the defendant, in substance to the effect that he believes the defendant cannot receive a fair and impartial trial in Adair county for the reason that the citizens of said county have become inflamed against the said John Doublehead; that divers and sundry threats of mob violence have been made by certain citizens of said county against said defendant; that affiant had been informed by the sheriff of said county that said sheriff had to threaten divers and sundry assemblies of persons with violence in the event they should storm the

county jail for the purpose of doing the defendant bodily harm; that affiant was informed by the sheriff of Adair county on the 8th day of December, 1922, that numerous persons in Adair county had asserted that it would not be safe for a local attorney to undertake the defense of the said John Doublehead; that the local newspapers of Adair county had carried lurid stories of the alleged murder committed by the said John Doublehead; that said newspapers had a general circulation throughout Adair county and that the facts in said newspapers tended to create a prejudice in the minds of such citizens as may serve on juries in said county; that the prejudice against the defendant was such that, although the counsel for the defendant had procured the services of one Dr. H. C. Dorsey of Ft. Smith, Ark., to make an examination of the said John Doublehead in the town of Stillwell on the 9th day of December, 1922; the undersheriff of Adair county refused to permit such examination to be made unless in company with a physician or physicians selected by the county attorney; and that the said John Doublehead was not free to consult with his attorney on account of the presence of persons hostile to him.

The state filed a response to said motion denying each and every allegation thereof.

The trial court heard evidence in support of and in opposition to such motion.

In support of the motion the only testimony offered was that of John A. Goodall, counsel for the defendant, whose testimony in chief was in substance and effect the same as set out in his affidavit in support of the motion. On cross-examination this witness admitted, however, that he had not discussed the case generally with citizens throughout the county, but had discussed the question of the probability of

the defendant procuring a fair and impartial trial with citizens in and around the town of Stillwell and a few at the town of Westville.

In opposition to the motion the state introduced several witnesses whose testimony was in substance to the effect that a fair and impartial jury could be procured to try the defendant in Adair county; that the only prejudice that seemed to exist in the minds of any of the citizens of Adair county was confined to the locality of the scene of the homicide and not elsewhere.

Upon this showing the motion was overruled.

It is well established in this jurisdiction that applications for a change of venue are addressed to the discretion of the trial court; that before a judgment of conviction will be set aside in the appellate court because the trial court overruled the motion for a change of venue there must be shown by the appellant a clear abuse of discretion on the part of the trial court. Turner v. State, 4 Okla. Cr. 164, 111 Pac. 988; Smith v. State, 14 Okla. Cr. 348, 171 Pac. 341; Emert v. State, 17 Okla. Cr. 406, 189 Pac. 195. It is evident from the showing here made that no clear abuse of discretion on the part of the trial court appears in denying the change of venue.

The next assignment of error relates to the admission in evidence of certain acts, conduct, and statements on the part of the defendant after his arrest and incarceration, which taken together amount to a confession of guilt, and which it is alleged the record discloses were induced by alleged threats of violence made to the defendant and by putting the defendant in fear of bodily harm unless such confession was forthcoming.

After having heard evidence in the absence of the jury as to the admissibility of these acts, statements, and conduct on the part of the defendant, the trial court held that the same were admissible. The defendant was the only witness who testified to any facts or circumstances which in the slightest degree tended to show that the confession may have been involuntary on his part.

The statement of the case contains an outline of the circumstances as to time and place and the substance of the acts, circumstances, and statements constituting the alleged confession. There was no dispute but that such confession was made as testified to by the state's witness. There was no dispute but that the defendant was taken from the jail, handcuffed, and carried to the scene of the homicide in an automobile, in company with the county attorney and a deputy sheriff and the city marshal of the town of Stillwell, the latter two being armed, one with a shotgun and the other with a rifle; that before the confession was made these parties were joined by four other men who lived in the neighborhood of where the crime was committed; that these latter men were unarmed; that they were all present at the time of the alleged confession.

There is some conflict in the testimony as to whether or not the defendant was warned that any statement he should make would be used against him in the trial of the cause. This is immaterial in view of the prior holdings of this court that such warning is unnecessary. Mays v. State, 19 Okla. Cr. 102, 197 Pac. 1064; Anderson v. State, 8 Okla. Cr. 90, 126 Pac. 840, Ann. Cas. 1914C, 314.

The testimony of the defendant in opposition to the admission of the alleged confession discloses that he was not afraid of the officers who took him to the scene where this

confession was made. The defendant, however, did testify that he was afraid that he might be mobbed by the people who met the officers; however, he testified that he did not notice that these men had any guns, nor did he testify that they threatened him in any way. While, on the other hand, the testimony on the part of witnesses for the state is clearly to the effect that no threats of violence were made against the defendant; that no inducements were offered to him to make this confession; that he was told only that if he ran or attempted to escape he would be shot, otherwise no effort would be made to harm him and that he would be protected.

There is nothing in the record to show that the defendant was influenced to make the confession by the display of the weapons carried by the officers. On the contrary, the defendant's own testimony is to the effect that he was not afraid when they started out; that he thought they were going to take him down to his mother's and that he got "kinder scared" when he got down to Sallisaw creek and saw those other people.

In deciding whether a confession is admissible in evidence the trial court is necessarily vested with a large discretion. However, this discretion should be exercised with great care looking to the due and proper enforcement of the law on the one hand and to the protection of the defendant on the other, in order that no injustice may be done him.

In Berry v. State, 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849, this court held:

"Primarily there are two facts which render a confession inadmissible: First, that it was obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination; and second, that it was made under such circumstances of hope or fear as to create a fair probability of its

testimonial untrustworthiness.   And while the greater num-
ber of cases hold the contrary, yet we think the proper rule
is that in the absence of a statute governing the matter,
prima facie any confession is admissible in evidence; and
where its admissibility is challenged by the defendant, the
burden is on him to show that it was procured by such means
or under such circumstances as to bring it within one or the
other of the conditions stated, unless there is something in
the confession itself or the other evidence on the part of the
state which shows that it is inadmissible.   This was so held
in Hauk v. State, 148 Ind. 238, 46 N. E. 127, 47 N. E. 465;
State v. Grover, 96 Me. 363, 52 Atl. 757; Com. v. Sego, 125
Mass. 213; Com. v. Culver, 126 Mass. 464; Rufer v. State, 25
Ohio St. 469; State v. Meyers, 99 Mo. 107, 12 S. W. 516;
State v. Storms, 113 Iowa, 385, 85 N. W. 610, 86 Am. St.
Rep. 380; State v. Incebice, 126 Iowa, 16, 101 N. W. 273;
People v. Barker, 60 Mich. 277, 27 N. W. 539, 1 Am. St. Rep.
501; State v. Jones, 171 Mo. 401, 71 S. W. 680, 94 Am. St.
Rep. 786.   And Professor Wigmore says that this is the
practical and natural rule, 'for if there is any reason to ob-
ject to the confession, no one can know it better than the
defendant.' He says further: 'Looking at the general princi-
ples of admissibility and the comparative rarity of untrust-
worthy confessions, as well as the contingent nature of the
dangers supposed to flow from improper inducement the more
practical rule would be to receive confessions without ques-
tion, unless they are shown to have been improperly induced
—especially since a contrary rule may involve the difficulty
of proving a negative.'   Wigmore on Evidence, vol. I, § 860.''

On the hearing before the trial court in the absence of
the jury the state made out a prima facie case to show that
the confession was voluntary, and in our opinion the mere
fact that the defendant testified to circumstances that might
inferentially show that he made his confession through fear
and under duress is not, of itself, sufficient to overcome the
state's showing based on the testimony of several persons
who were present when the confession was made, which testi-

mony clearly shows that such confession was voluntary. When the matter was presented to the jury, the defendant did not offer himself as a witness, nor present any other testimony before the jury to show that his confession had been extorted by fear of violence.

Considering the evidence, pro and con, on the question of admissibility of defendant's confession, the conclusion is reached that the same was properly admitted; that there is not such a showing that the same was extorted from the defendant by threats of violence to him or other evidence of fear of violence on his part; and that on the record before us no reversible error is presented.

However, this court cannot give its unqualified approval to the method employed by the county attorney and other officers of Adair county in procuring this confession. The undisputed facts are that the defendant was taken from the jail, was not told where he was to be taken, was handcuffed, placed in an automobile with two officers who were armed with deadly weapons, a rifle and a shotgun, each of which were visible to the defendant. The display of these weapons on the part of those who had the defendant in custody, and the carrying of such weapons during the entire time the confession was made, had a tendency, no doubt, to impress the defendant with the idea that, should he not confess, serious bodily injury might befall him at the hands of those who had him then in custody.

Ordinarily these implied threats of violence by the display of such deadly weapons would be sufficient to render this evidence inadmissible and to require a reversal of this judgment. But the defendant, on the other hand, testified that he did not fear these officers who were armed; that the confession was not induced by the display of such armed force, and on the other hand the defendant testified that his

only fear was of those parties who met the officers at the crossing of the creek a short time before the defendant's home was reached. The undisputed evidence is that, as to these men, none of them were armed; that they made no threats against the defendant, nor did anything that would render the defendant's confession involuntary and inadmissible.

This conviction is not based entirely upon proof of the corpus delicti corroborated only by the extrajudicial confession of the defendant, but in addition to proof of the corpus delicti there is proof of circumstances corroborative thereof, independent of the extrajudicial confession of the defendant, sufficient to sustain the conviction. For that reason we believe that the judgment should not be reversed, for if a new trial were ordered no honest and intelligent jury could arrive at a conclusion different from the guilt of the defendant of the crime of murder. This assignment of error is alluded to infra in connection with the assignment relating to alleged improper remarks of the prosecuting officer, and what is here said must be considered therewith.

We shall next consider that group of assignments of error which relate to the sufficiency of the evidence. In this connection it is strenuously contended that the evidence is such as to create a doubt as to the sanity of the defendant to such an extent that it would be a miscarriage of justice to sustain a verdict of guilty of murder with punishment assessed at death, for the reason that the testimony of an unbiased alienist was to the effect that the defendant was incapable of forming any premeditated design to kill.

This assignment of error requires a full consideration of the testimony of Dr. H. C. Dorsey, a specialist in the treatment of nervous and mental diseases, a resident of Ft. Smith,

Ark., who was the only witness introduced in behalf of the defendant on the question of his sanity. There is no question but what this witness was qualified to testify upon this subject.

This witness, after testifying that he was not permitted to make an examination of the defendant in private, testified that the examination made of the defendant by him occurred at the county jail of Adair county in the presence of another physician, Dr. Evans, another man, and also that there was another prisoner in the cell; that the examination occupied a period of time of about 15 minutes; that said examination was not very satisfactory because of lack of time and because of the surrounding conditions under which it was made; that the defendant seemed to be unconcerned about the examination; that he did not understand the English language very well and for such reasons the witness was unable to get a very satisfactory history of his case; that from such examination he found that the defendant had been a drinker of intoxicating liquors, had been drunk several times, and he stated that he had had a venereal disease for about ten years; that a test of the defendant's blood showed two-plus Wasserman, which means the presence of syphilis; that there was no way of telling whether such disease was inherited or contracted; that as to mental deterioration from syphilis it depends on how long the patient has been infected with the disease; that mental changes are frequently seen after a patient has had the disease about ten years, and from that time on, and the longer the patient has had the disease the more pronounced are the mental changes.

Thereupon the witness testified as follows:

"Q. Now, Doctor, I wish you would describe the types of insanity that are characterized by violence—go into that fully, if you please? A. That would take quite a long time

to go into all of them and describe them. There are several types of insanity in which violence is one of the things that you see. Probably the worst type is the type called paranoia; another is dementia praecox; another type of insanity is acute monomania and another type is melancholia; sometimes they are called under different names by different authors. These are given by Church and Peterson. Q. Now, Doctor, with reference to dementia præcox, I wish you would state whether or not that disease would likely be caused by alcoholism, or syphilitic infection? A. It is not positively known what causes dementia præcox, but Church and Peterson, in their book, state that heredity, alcoholism, and syphilis are three things as given as probable causes of the disease, but just exactly to be absolutely definite it has not been determined, but these are the three things given by those authors. Q. Doctor, what would be the symptoms in case of insanity supposed by alcoholism and syphilitic infection? What would be the symptoms you would notice in a person so infected? A. Well, the main thing would be the mental deterioration. The mind is not normal and the moral senses are blunted; you have lack of attention and the judgment is not normal, but the main thing is mental deterioration of some kind. Q. Now, would a patient so infected be capable of premeditation? A. How is that? Q. Would a patient affected by a case of dementia præcox be capable of premeditation? A. That is hard to answer. If a patient has dementia præcox, where they are more or less normal, there are instances —might be, and then again I wouldn't think so. There would not be an acute stage at any time. Then when they have an acute attack and that subsides and they have a quietessent stage, but in an acute attack they would not be capable of forming premeditation. Q. Now, referring to the patient, what did you notice, if anything, apparently, that would cause you to believe that he is afflicted with dementia præcox? A. Well, as I said just now, my examination was not completed enough to make a diagnosis of dementia præcox, or any other disease. That is, to classify it in any form. Q. What did you notice in his condition out of the ordinary, referring to—A. He didn't seem to be exactly interested spec-

ially in the outcome of things. He just lacked indifference, in other words. Q. Of what is that the characteristic, Doctor? A. That is characteristic of dementia præcox. Q. Doctor, have you had any experience with men who have served as soldiers in the late war? A. I have. Q. If a patient who is afflicted with chronic alcoholism and syphilitic infection, and an inherited taint of insanity, should be gassed and should undergo, prior to any battle, exacting military discipline, such as was had in the late war, and his physical condition, after this experience, should show a marked loss of weight, what effect do you think that this would have on his mental condition? Any patient? I am not speaking of this one? A. I do not know whether I can answer that question or not; it has got so many clauses to it, you know. The question is a man that has had venereal disease and chronic alcoholism and hereditary taint of insanity, and went through this war experience and the physical condition was wrecked—what effect that would have on their mental condition? Q. Yes; or likely have, Doctor? A. Well, any time the physical condition is run down the mental condition is weakened too, but I do not know whether I can answer that question—Q. Well, what has been your experience with patients who have undergone this training and who have been wounded, or gassed, and especially patients that come from the farming class of people? A. Well, in our examination in this veterans' bureau we find that the great majority of mental cases come from the farming class. All types, even up to the most severe. Even dementia præcox. We have only a few of the paranoias and quite a number of dementia præcox. Q. State whether or not these cases that you refer to are characterized by violence and by violent acts on the part of the patient? A. These dementia præcox cases? Q. No; I am talking of this case. Yes; dementia præcox? A. Well, those cases of dementia præcox are—have at some time or another, as I just testified—there is violence. Not necessarily during the examination. I mean at that particular time, but it other during the course of the disease. Q. Is it possible, doctor, for insanity to be inherited? A. Yes, sir. Q. Is it

possible for it to skip one or more generations? A. Yes, frequently does. Sometimes skips three or four and sometimes only one or two.''

Section 1511, Compiled Statutes 1921, in part provides that all persons are capable of committing crimes except those belonging to the following classes:

''Fourth. Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness.''

In construing said subdivision of section 1511, supra, this court has held:

''The test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act.'' Alberty v. State, 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248; Smith v. State, 12 Okla. Cr. 307, 155 Pac. 699; Owen v. State, 13 Okla. Cr. 195, 163 Pac. 548; Roe v. State, 17 Okla. Cr. 587, 191 Pac. 1048.

A careful perusal of the testimony of Dr. H. C. Dorsey discloses that, from the examination made by him of the defendant, he was not able to diagnose the defendant's mental condition as that of ''dementia præcox'' or any other mental disease. However, the doctor did testify that there were some symptoms characteristic of ''dementia præcox,'' but there is nothing in his testimony which in the slightest degree would indicate that this defendant had reached that stage of mental incapacity as to be unable to distinguish between right and wrong as applied to this particular act and to be unable to understand the nature and consequences of such act.

The testimony of this specialist was directed to his study and observation of mental diseases and their symptoms as set out in the books on that subject and as found in other patients who had come under his treatment. This witness was permitted to detail all the alleged symptoms of mental deterioration found in the defendant, and in addition he testified to those symptoms which were evidences of insanity, although the specialist himself would not and did not testify that the defendant was insane to such a degree as to render him criminally irresponsible within the meaning of the foregoing statute.

The trial court fully and fairly instructed the jury on the subject of the law of insanity. The jury returned a verdict of guilty, necessarily finding the defendant to be sane and the evidence is such that it not only convinces this court that there was no question but that the defendant was sane at the time of the commission of this crime, but also that the evidence introduced by him on the question of his sanity was insufficient even to overcome the legal presumption of sanity assumed to exist in all those charged with crime.

In the closing argument of the case special counsel for the state stated in substance:

"If the jury sends the defendant to the penitentiary for life, I predict that within five years he will be on the streets of Stillwell, with the blood of Uncle Jimmie Davenport still on his hands."

Counsel for the defendant objected to this statement on the ground that it was not based on anything in the record, that it was prejudicial to the defendant, and asked the trial court to instruct the jury to disregard it. The trial court overruled the motion. It is here contended that such an argument was an appeal not based on the evidence and to the popular prejudice of the jury against acts of clemency, and

as such operated to incite the jury, because of passion and prejudice to inflict the death penalty instead of life imprisonment on the verdict of guilty on matters not based on the evidence in the case.

This court has held:

"The county attorney in argument may draw all proper inferences which are deducible from the relevant and competent evidence admitted." Prather v. State, 14 Okla. Cr. 327, 170 Pac. 1176.

Also it has been held:

"The county attorney * * * should not press * * * any deductions from the evidence that are not reasonably legitimate." Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101.

While it is a matter of common knowledge and notoriety that at the time this case was tried numerous acts of executive clemency had been and were being granted by the chief executive of this state to such an extent that there was aroused great public indignation, that matter should not have been inferentially commented upon in the argument of this case, as for that reason it all the more tended to and was calculated to prejudice the jury against the defendant and to operate in the infliction of the death penalty instead of life imprisonment, either of which punishments the jury was authorized to assess in this case should they find the defendant guilty.

Under section 2820, Compiled Statutes 1921, this court has power either to reverse, affirm, or modify the judgment appealed from. The error here complained of is not sufficient and does not require a reversal of this judgment. The evidence of the defendant's guilt is clear. The language complained of was only prejudicial in that it might have tended to accentuate the degree of punishment from that of life

imprisonment to that of death. For such reason it is held that, while the argument made was an improper one, it was only prejudicial to the extent heretofore indicated.

The Attorney General has not filed a brief in this case, but has filed a statement to the effect that the conclusion has been reached by him, and by the representatives of the state who tried this case, that the judgment of the trial court should be modified by reducing the same from death penalty to confinement in the penitentiary for life.

While this is an atrocious crime deserving of severe punishment, yet were it not for the testimony of the defendant himself relative to the alleged confession there are circumstances attending said confession which would otherwise render it inadmissible and would have caused a reversal of this judgment; also the argument complained of, we think, was prejudicial to the extent heretofore indicated. For such reasons it is the opinion of this court that the judgment of conviction should be modified to provide that the defendant, John Doublehead, be imprisoned in the state penitentiary for life at hard labor instead of that he suffer death by electrocution.

It is therefore ordered, adjudged, and decreed that the judgment of conviction of John Doublehead for murder rendered in the district court of Adair county on the 19th day of December, 1922, sentencing the said John Doublehead to be electrocuted, be, and the same is, hereby modified to provide that the said John Doublehead be imprisoned in the state penitentiary for life at hard labor, and as so modified the judgment is hereby affirmed.

The clerk of this court is hereby directed to forward a duly certified and attested copy of this opinion to the warden of the state penitentiary at McAlester, Okla.

BESSEY and DOYLE, JJ., concur.