# EARL QUINN v. STATE.

No. A-8338.　Nov. 29, 1932.
(16 Pac. [2d] 591.)

James H. Mathers and James C. Mathers, for plaintiff in error.

J. Berry King, Atty. Gen., F. M. Dudley, Asst. Atty. Gen., Bruce Potter, Co. Atty., and Ralph G. Harder, Asst. Co. Atty., for the State.

CHAPPELL, J.   Plaintiff in error, hereinafter called defendant, was convicted in the district court of Kay county of murder in the killing of Jessie Griffith, and his punishment fixed by the jury at death.

The record consists of four volumes, containing about 2,500 pages.   In addition to oral argument, the state and defendant filed voluminous briefs.

The evidence of the state was that the Griffith sisters, Jessie and Zexia, left their home in Blackwell at about 5 o'clock on the morning of December 28, 1930, in an automobile, driving to Norman; that their dead bodies were found at about 9 o'clock, a. m. of that day, a mile and a half southeast of Tonkawa; that Jessie had been shot twice in the head and raped; that Zexia had been shot three times in the head, but her person not violated; that their automobile was found about fifteen miles southeast of Tonkawa, near Ceres; that there was blood upon a rear fender and the running board, but no blood in the car; that they had apparently been robbed of whatever money they possessed, except a small amount of change; that defendant, under the assumed name of Earl Howard, with his wife, was living in a rooming house in Tonkawa;

that on the night before the murder he was in Tonkawa and out in the country to a dance and back in Tonkawa and out on the road around Tonkawa in his car until about 5 o'clock in the morning, armed with a small pistol, and in an intoxicated condition; that about a week previous, defendant's wife had purchased six .32 caliber shells for a pistol, and that five similar shells were found near the bodies of deceased; that on the 28th day of November, 1930, which was Thanksgiving Day, and about 30 days prior to the commission of the offense for which defendant was on trial, he stopped the car of Myrtle Patton, compelled her to go with him, and committed rape upon her at or near the place where the bodies of the Griffith sisters were found; that at about 3:30 or 4 o'clock on the morning of the killing, defendant stopped a young couple on the road south of Tonkawa and compelled them to go some distance with him; thereupon, learning who they were, he apologized and permitted them to leave; that, after the commission of the crime, he disappeared and was not apprehended until several months thereafter.

The evidence of the state tending in any wise to connect the defendant with the commission of the offense was wholly circumstantial.

The defendant did not take the witness stand. The defense was an alibi.

He complains of ninety-five specific errors, many of which are without any merit, and others are not supported by the record.

Defendant contends that the court erred in overruling his application for a change of venue.

He filed a verified application for a change of venue, and alleged: "That the minds of the inhabitants of Kay

county, in which the case was then pending, were so biased and prejudiced against him that neither a fair and impartial jury could be secured nor a fair and impartial trial had in the county," because:

(1) All the newspapers of Kay county, including those of Blackwell, Ponca City, Tonkawa, Newkirk, and the daily papers of the state had published inflammatory, prejudicial, and untruthful statements against him, giving the details of the horrible crime, pictures of the deceased ladies and of defendant, with accounts of his fleeing and hiding; that there was no doubt of his guilt, and that the death penalty would be demanded; that all of the newspapers had a wide circulation in said county, and were generally read by the people who would compose the jury in the trial of said cause, and that by reason thereof the guilt of defendant was firmly fixed in the minds of the people constituting the jury who would try him, and would render the securing of a fair and impartial trial impossible.

(2) That the people of Kay county were so maddened and incensed over the commission of the crime that talk generally throughout the county was that defendant ought to be lynched, and that had he been apprehended at the time of the killing or soon thereafter he would have been mobbed, as was threatened, and that feeling against him still continued throughout the county to such an extent that during the preliminary trial held June 23 and 24, 1931, the above-mentioned newspapers printed and circulated the story that a mob was likely to take defendant and lynch him; that the courthouse was guarded to prevent mob violence; and that it was necessary to guard him heavily to keep him from being killed by the mob.

(3) That at the time of the preliminary trial the crowds were so great and the curiosity of probable jurors was so much aroused that it was necessary to lock the courtroom doors against the crowd; that more than a thousand people attempted to attend the preliminary trial and hear the testimony, and that for hours before the courtroom doors were opened they jammed the corridors, stairways, and yard of the courthouse, awaiting an opportunity to get into the courtroom, and that the court was compelled to and did keep armed guards in the courtroom during the preliminary trial to prevent any attempt at mob violence.

(4) That immediately after the commission of the offense and during the time of defendant's absence, and following his arrest and up to the time of the making of the application for a change of venue, the county attorney, with other officers, had talked to many persons in said county about his guilt, and had given out to the newspapers untrue, inflammatory, and prejudicial statements against him, alleging his guilt and promising the infliction of the death penalty, and that all of such untrue, inflammatory, and prejudicial statements were published by word of mouth and in the newspapers aforesaid, and were widely read, commented on, and believed by the people of Kay county, who usually compose juries in such cases.

(5) That the deceased had lived in Kay county for a number of years and had a large circle of friends, who had circulated throughout the county reports that defendant was guilty; that he was practically a stranger in the county, without friends or influence, and that by reason of all of the aforesaid, the minds of the people of Kay county, who would usually compose a jury for his trial, were so inflamed, biased, and prejudiced against him that

it was impossible for him to secure a fair and impartial trial.

Attached to the application is a large number of newspaper articles showing the truth of the allegations of wide publication of matters prejudicial to him. The application was supported by affidavits of 29 citizens of Kay county, to the effect that a fair and impartial jury could not be secured and a fair and impartial trial could not be had in Kay county; some of the affidavits going into particular detail as to the discussion of defendant's guilt by the citizens of the county, the publication of the newspaper articles referred to, and the general expression of opinion of defendant's guilt.

The state resisted the application, supporting the same by the affidavits of 143 citizens of the county, all to the effect that they had read newspaper articles relative to the crime, had heard the matter of the untimely death of the Griffith sisters and defendant's connection with the same discussed generally by the citizens of the county, who formed or might form juries of the county, and that they did not believe any bias or prejudice existed against defendant in the county that would prevent him from having a fair and impartial trial.

The granting of a change of venue is by statute made discretionary with the court. This court will not reverse the ruling of the trial court denying an application for change of venue unless it is made clearly to appear that there has been such an abuse of discretion as to amount practically to a denial of justice. Starr v. State, 5 Okla. Cr. 440, 115 Pac. 356; Edwards v. State, 9 Okla. Cr. 306, 131 Pac. 956, 44 L. R. A. (N. S.) 701; Sayers v. State, 10 Okla. Cr. 233, 135 Pac. 1073; Maddox v. State, 12 Okla. Cr. 462, 158 Pac. 883; Emert v. State, 17 Okla. Cr. 406,

189 Pac. 195; Williams v. State, 19 Okla. Cr. 307, 199 Pac. 400; Johnson v. State, 20 Okla. Cr. 196, 201 Pac. 1006; Warren v. State, 24 Okla. Cr. 6, 215 Pac. 635; Kirby v. State, 25 Okla. Cr. 330, 220 Pac. 74, 33 A. L. R. 1212; Doublehead v. State, 27 Okla. Cr. 375, 228 Pac. 170; Davis v. State, 53 Okla. Cr. 411, 12 Pac. (2d) 555.

The question is: Does defendant's case fall within the exception to the general rule?

In Bishop's New Criminal Procedure, Vol. 1, page 52, it is said:

"The discretion is judicial, not personal in the individual judge. The course of the courts in our states differs as to reviewing, in a higher court, a judicial discretion exercised in a lower. There are states in which the higher tribunal will rarely or never interfere in this matter of changing the venue; but the better and more common doctrine is, that the decision of the lower court will be corrected in extreme cases of abuse, and in no other."

In Starr v. State, 5 Okla. Cr. 440, 115 Pac. 356, 363, this court said:

"By 'abuse of discretion' is meant a clearly erroneous conclusion and judgment—one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing."

This court in numerous cases has said that:

"It is not an abuse of discretion to deny a change of venue where the subsequent proceedings show that there was no difficulty in securing a fair and impartial trial." Warren v. State, 24 Okla. Cr. 6, 215 Pac. 635; Huffman v. State, 28 Okla. Cr. 296, 230 Pac. 272; Dodson v. State, 38 Okla. Cr. 85, 242 Pac. 578.

In People v. Kromphold, 172 Cal. 512, 157 Pac. 599, that court said:

"Under the terms of Pen. Code §§ 1033, 1035, on application for change of venue because a fair trial cannot be had in the county, the proceedings in the impanelment of the jury, in so far as they throw light upon that question, may be taken into consideration."

The record in the case at bar discloses that 25 prospective jurors were excused by the court for cause; that six jurors were peremptorily challenged by the state, and nine by the defendant; that after all the peremptory challenges had been exhausted, additional jurors were called into the box; one in particular in examination on his voir dire said, "I just formed an opinion that if it was such as they published defendant would have a hard time proving himself innocent"; that he still had the opinion and that it would require at least some evidence to be introduced to remove that opinion.

Defendant challenged this juror for cause, and the same was denied by the court. Defendant challenged for cause another juror whose answers were such that the challenge should have been sustained. Thereupon defendant requested the court to grant him additional peremptory challenges, which the court refused.

In addition to all of this, certain questions asked by jurors during the trial and the question asked the trial judge, after the cause had been submitted to them, as to which would be the most severe punishment, life imprisonment or death, all tend to support defendant's contention that he could not and did not have a fair and impartial trial.

Under section 2628, C. O. S. 1921, the county attorney in resisting an application for change of venue may

examine the witnesses orally, in open court, for the purpose of showing that those making the affidavits in support of the change are not credible persons, and that a fair and impartial trial can be had in the county.

No oral testimony was offered; the county attorney electing to stand upon the prima facie showing made by the defendant and the counter affidavits filed by him on behalf of the state. This court will not only look to the showing made by the defendant and the counter showing by the state and to the proceedings in the impaneling of the jury, but will also, when necessary, look behind the mere record and take notice of that which is generally known by the people of the community where the trial is had, in determining the issue of abuse of discretion in the granting or refusing of a change of venue.

The counter showing made by the state not being sufficient to overcome the prima facie case made by the defendant, it was an abuse of discretion for the trial court to refuse to grant a change.

Defendant next contends that the court erred in refusing to permit the witness Reber to make ballistic and other tests in the presence of the jury.

Reber had testified that he did not fire the pistol the state claimed defendant used in the killing, but that his testimony was based solely upon the statements of the assistant county attorney and others that one of the bullets presented to him caused the death of Jessie Griffith, and that the other had been fired from the pistol then in evidence. At the conclusion of his testimony, the witness requested the court for the privilege of making the experiment himself, and this request was agreed to by the state and defendant, but refused by the court.

It is always competent to make tests in the presence of the jury.   17 Cyc. 294; 16 Corpus Juris, 810; 10 R. C. L. 1000; 16 R. C. L. 299.

Evidence of experiments made out of court and not in the presence of the jury is admissible upon the same principle that the experiments themselves may be conducted in the jury's presence.   Irby v. State, 18 Okla. Cr. 671, 197 Pac. 526.

When evidence of experiments is sought to be introduced, it must be shown that the experiments were made under like conditions, on like material, with similar apparatus and under similar circumstances, fairly and honestly made, and they must be testified to by competent persons having expert knowledge thereof.   Gibbons v. Territory, 5 Okla. Cr. 213, 115 Pac. 129, 130, 10 R. C. L. 1002.

While the matter of permitting experiments to be made in the presence of the jury, or evidence introduced of experiments made out of the presence of the jury, is largely discretionary with the trial court, yet such discretion may be abused.

The only possible reason for refusing this request by the court would be the saving of time and expense.   Trial courts are to be commended for speeding up trials, but human life is too precious and the scales of justice swing sometimes upon too close a balance to warrant such refusal.

The witness, the state, and the defendant having requested permission of the court for the witness to conduct the experiments in or out of the presence of the jury, and no good cause appearing in the record why such request was not granted, it was error for the court to refuse it.

Defendant next contends that the court erred in refusing to direct the exhumation of the bodies, that the bullets which caused the deaths might be brought into court and ballistic tests, made by competent persons to determine if the gun claimed to be owned and used by defendant was the one which fired the bullets that killed deceased.

If the ballistic experts with bullets taken from the bodies of the deceased and with the gun claimed to have been owned and used by defendant in the killing conducted experiments in or out of the presence of the jury which showed that the fatal and test bullets were fired from the same gun, and that the gun belonged to the defendant, it would furnish extremely important evidence tending to establish the guilt of defendant. On the other hand, if such test disclosed that the bullets causing the death of deceased were not fired from the pistol claimed by the state to be owned and used by defendant, then the case would be greatly weakened. The state made no objection to this request, and it should have been granted in the interest of truth and justice.

Defendant makes some complaint about certain newspapers found in the jury room during the progress of the trial.

Upon his motion for a mistrial, the court conducted a hearing where it was admitted that some of the newspapers found in the jury room had been purchased by defendant's counsel and upon their direction delivered to the jurors, while others had been furnished to the jury by the officers of the court. Since defendant was responsible for part of the newspapers reaching the jury room, he will not be heard to complain thereat, although newspapers carrying accounts of the trial have no place in the

jury room.   At another trial of this case the judge should take extreme precautions to see that no newspaper containing any account of the trial reaches the jury.

An examination of the record, containing copies of the newspapers complained of, discloses that the county attorney and counsel for defendant tried their case in the newspapers and by word of mouth to the public, before a jury was empaneled.

The reporters, eager for sensational news, plied counsel with numerous questions and quoted them as giving interviews about what they expected to prove, all of which poisoned the minds of prospective jurors and helped prevent the securing of an impartial trial.

It is not the business either of the state or defendant to convince the public of the guilt or innocence of a person charged with crime.   The duty of the state is to present its evidence to a duly constituted jury, and that of defendant to present his evidence to the jury, leaving the issue to be settled by them and not by public opinion.

Finally, defendant contends that the court erred in admitting the testimony of the witness, Myrtle Patton, as to the rape claimed to have been committed upon her by him about 30 days prior to the date of the crime in the case at bar.

Over defendant's objection, the court permitted Mrs. Patton to testify that on the 28th day of November, 1930, the same being Thanksgiving Day, early in the morning she was driving from Blackwell to Muskogee; that a short distance south of Tonkawa, her car was crowded into a ditch by a man driving a Buick coupe; that he forced her to get into his car and took her off on a side road some distance away, where, under threat of killing her, she sub-

mitted, and he had sexual intercourse with her; that he brought her back to her car and she proceeded on her way to Muskogee; that she made no complaint to any public officer, and never told her father or husband of the occurrence, nor said anything about it to any person until she read of the killing of the Griffith sisters and saw defendant's picture in the newspapers. The county attorney told the witness to look about the courtroom and see if that man was present; she answered, "Yes, sir." Without giving her an opportunity to pick the man out of the crowd, the county attorney asked her if defendant was the man who committed the rape, and she answered, "Yes, sir."

16 Corpus Juris, at page 586, states the rule:

"The general rule is that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible. The rule extends to the accusation of another crime, as well as to the evidence of its actual commission."

The general rule has been followed by this court in numerous cases. Smith v. State, 5 Okla. Cr. 67, 113 Pac. 204; Proctor v. State, 8 Okla. Cr. 537, 129 Pac. 77; Wisdom v. State, 18 Okla. Cr. 118, 193 Pac. 1003; Alexander v. State, 24 Okla. Cr. 436, 218 Pac. 543.

To the general rule that evidence of separate and independent crimes is inadmissible to prove the guilt of a person on trial for a criminal offense, there are several well-recognized exceptions. The general rule does not apply when the other offense (1) is a part of the res gestae, Tempy v. State, 9 Okla. Cr. 446, 132 Pac. 383; Littrell v. State, 22 Okla. Cr. 1, 209 Pac. 184; Austin v. State, 28 Okla. Cr. 73, 228 Pac. 1113; Carmichael v. State, 44 Okla.

Cr. 160, 279 Pac. 515; (2) or shows a scheme of criminal action, Carter v. State, 6 Okla. Cr. 232, 118 Pac. 264; State v. Rule, 11 Okla. Cr. 237, 144 Pac. 807; Glaze v. State, 13 Okla. Cr. 431, 165 Pac. 211; Hollingshead v. State, 21 Okla. Cr. 315, 207 Pac. 108; Wilson v. State, 28 Okla. Cr. 102, 228 Pac. 1108; O'Quin v. State, 30 Okla. Cr. 87, 235 Pac. 247, 248; Jackson v. State, 42 Okla. Cr. 86, 274 Pac. 696; (3) or shows intent, Dunscombe v. State, 19 Okla. Cr. 54, 197 Pac. 1073; Littrell v. State, 21 Okla. Cr. 467, 208 Pac. 1048; Rambo v. State, 32 Okla. Cr. 229, 240 Pac. 751; Jeffries v. State, 37 Okla. Cr. 110, 257 Pac. 333; (4) or proves identity of accused, Miller v. State, 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383; Davis v. State, 30 Okla. Cr. 61, 234 Pac. 787; (5) or shows motive, Carter v. State, 35 Okla. Cr. 421, 250 Pac. 807; Fray v. State, 46 Okla. Cr. 260, 285 Pac. 142; Ditmore v. State, 49 Okla. Cr. 228, 293 Pac. 581; Cole v. State, 50 Okla. Cr. 399, 298 Pac. 892.

Upon the general subject of inadmissibility of this character of evidence, see Boyd v. U. S., 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077; Hall v. U. S., 150 U. S. 76, 14 S. Ct. 22, 37 L. Ed. 1003; Smith v. U. S. (C. C. A. 9) 10 F. (2d) 787.

While the federal authorities are not conclusive on this court, they are persuasive.

The state in its brief recognizes the general rule and the exceptions set forth above, but argues that this evidence was admissible for the purpose of showing identity and motive.

Even if defendant had committed rape upon Mrs. Patton 30 days prior to the murder of Jessie Griffith, that would not tend to show a plan or scheme; nor would it

serve to identify the defendant in the commission of the murder 30 days thereafter. We have been unable to find any cases where evidence of such widely separated and dissimilar crimes has been held to be competent in the trial of a case of this character.

It is earnestly urged that the instruction of the court, that they could not convict because of the rape, but must find the defendant guilty of the crime charged beyond a reasonable doubt, safeguards the rights of the defendant. With this contention we cannot agree. Mrs. Patton was called as a last witness for the state in its case in chief. All other evidence against the defendant was climaxed with the details of this horrible crime. The last impression on the jury as the state closed its case in chief was of a fiend committing the brutal crime of rape under the harrowing circumstances as detailed by the witness. Not content with climaxing their case with this story, the county attorney pointed the defendant out to the witness and asked her if he was the man who committed the rape. This of itself was unfair and improper examination. The witness should have been permitted to select the man she claimed raped her, instead of having the county attorney aid her in pointing him out.

The evidence of Mrs. Patton was improper and highly prejudicial. No instruction of the court could take this last impression from the minds of the jury. The admission of this evidence would have required a reversal of the case, even though there were no other errors in the record.

A dastardly crime has been committed. It is the duty of the officers of the law and the court to see that the party guilty of this offense is brought to trial and justly punished. But this will not justify the obtaining

of a verdict of guilty through an unfair trial, or incompetent evidence.

A careful examination of the whole record discloses that the defendant did not have that fair and impartial trial guaranteed to him by the Constitution and laws of the state.

For the reasons stated, the cause is reversed and remanded, with directions to the court to grant a change of venue, and that the court to which the case is transferred proceed with a trial of the case in accordance with the opinion.

DAVENPORT, P. J., concurs.    EDWARDS, J., dissents.