SUBER *v.* THE STATE.

526

No. 8865.   FEBRUARY 22, 1933.   REHEARING DENIED MARCH 4, 1933.

*Titus & Dekle* and *J. J. Hill,* for plaintiff in error.

*George M. Napier, attorney-general, G. C. Spurlin, solicitor-general, T. R. Gress, assistant attorney-general,* and *Clifford E. Hay,* contra.

RUSSELL, C. J.   Homer Suber, Hazel Murphy, and Carey Cone were jointly indicted for the offense of rape.   Suber was tried separately, was convicted with a recommendation to mercy, and his sentence was fixed at a maximum and minimum of ten years.   His motion for a new trial was overruled, and he excepted.

Katherine Parker, the alleged injured female, testified in part: Went to my brother's on Monday afternoon. Had been there two ·days and a half on Wednesday night. Wednesday night is the night I took the trip with Homer Suber, Carey Cone, and Hazel Murphy. Hazel and Mr. Suber came over there Tuesday night, and said there was going to be a party at Mrs. Carter's or Mrs. Baker's one, and asked me if I would go with Carey. Carey was there, and Hazel wanted to make a date with me. I told her I would go if my brother James would let me. My brother told me to go if I wanted to. They were traveling in a two-seated automobile with Mr. Homer Suber and Miss Murphy on the front seat. Carey Cone was at the gate and got into the car there. They were all drinking. I had seen them drinking. This witness recited two separate efforts made by Suber to have carnal knowledge of her, in each case with the aid of Murphy, which were unsuccessful, and testified as follows as to how the act was accomplished: "When we got down there right close to town, not so terribly far, two or three miles from town, we stopped again and got out of the car and when he [Suber] did I says, 'I'm going home;' and I crawled out of the car, and Cary says, 'No, you aint going to walk home.' I says, 'I am too,' and I started off walking and went a way up the road, going toward town. Homer had gone, I guess, about two miles from the bridge when I got out of the car and started walking off. It was then between midnight and day. . . As I started walking off, telling them I was going home, Mr. Cone come up there, caught hold of my hand and told me I was not going to walk home; they carried me off, and they were going to carry me back. I told him they were not, neither, 'I just aint going.' I slung Carey Cone in the ditch. When he came back he caught hold of my hands and pulled them behind me, and I could not get loose from him; so I turned and went back to the car, and then Mr. Suber caught hold of my hand on one side and Carey Cone had hold of the other. I told him to turn me loose, I didn't need no help getting in that car. · So they started to put me in the car, and Miss Hazel says, 'Don't put her in this side; carry her up in the other one,' and when they did, they carried me on the other side of the car and put me in there. Homer Suber and Carey Cone. When they put me on the front seat, Miss Murphy had just got in under the steering-wheel, and they put me up there, and she shut the door after she got in there,

and Homer was at the other door; and she says, 'We are going to ride on the front seat going home,' is what she says. I says, 'I don't know whether I'm going to ride in this car back home or not,' so we taken it. Homer and Carey got in on the back seat. She says, 'Homer, don't get on the back seat; get in the front,' and when he got in the front, that is when he turned me around and all, and put my feet on the back of the car and completed his act of sexual intercourse with me, he put one foot up that high [indicating], up over the windshield, and one where the front door shuts, and got up. He pulled down my bottom clothes, and pushed up my top clothes and had sexual intercourse with me. Somebody was holding my hands, but I could not see who it was; whoever it was was behind me; don't know whether it was Miss Murphy or Mr. Cone. Can not say for sure. My head was in Miss Murphy's lap. She was sitting under the steering-wheel, and my head was right up side of it. No, sir, I could not say who was holding my hands back at that time. I was held that way, with my head in Hazel Murphy's lap, one foot up above the windshield and the other over the door, for about thirty minutes, I guess. While in that position Homer Suber had sexual intercourse with me. Up to that time hadn't any of them succeeded in having intercourse with me."

Carey Cone testified: "We went back together to the car. Mr. Suber was standing out on the right-hand side of the car, with the door open. Miss Murphy was sitting under the steering-wheel. Mr. Suber told Katherine to get in the front seat, and me and him would get on the back seat and come to Thomasville and come home. Miss Parker got on the front seat with Miss Murphy, and I got on the back seat and sat down. Mr. Suber made some remark to me about getting in, or keeping my seat, or something. He got in the front seat then, with Miss Parker and Miss Murphy. He started to embrace Miss Parker. It seemed he tried to get his arms around her, but I could not exactly say what he did do. I did not see him do anything. He had pushed her over against Miss Murphy, and it seemed he was trying to embrace her. I did not see Hazel Murphy do anything. I think the dashlight was on in the car. In fact, I was sitting in the back seat, not paying very much attention to what they were doing at that time. No, sir, I could not say about where Suber placed this Parker girl's feet, or either of them. So far as I know, what he done, he just got her pushed over on Miss Murphy

and just kind of wallowed around her, or just kind of embraced her or something, looked like he was. I guess may be it was five minutes that he had her pushed over that way and wallowed around her. . . No, sir, I could not say that he had unbuttoned his pants and exposed his private parts. I would not say, because I don't know."

James H. Parker, a brother of Katherine Parker, testified that she made complaint to him the first time he saw her on Thursday morning, after the Wednesday night she went out with the defendants.

The first special ground of the motion for a new trial, numbered 4, avers: "During the progress of the trial and after Katherine Parker, the female alleged to have been raped by movant, had concluded her testimony, the State caused to be sworn and put upon the witness-stand, as a witness for the State, one Miss Dorothy Williamson. Counsel for the State stated to the court, when offering this witness, that it was the purpose of the State to prove by Miss Williamson a separate and distinct offense of a similar nature committed upon the witness Dorothy Williamson on a previous occasion by the movant. Immediately upon this statement by State's counsel, movant objected to the admissibility of the evidence of this witness, so sought to be elicited by the State, upon the ground that the evidence of this witness so offered by the State, of a separate and distinct offense not connected with the offense for which movant was being tried, there being no question as to the identity of the accused, and the question of motive or intent not being involved in the offense for which movant was being then tried, the testimony of the witness was immaterial, irrelevant, prejudicial to the rights of the defendant, and inadmissible." The court overruled the objection of movant, and announced the following ruling: "It is admissible to show the 'bent of mind;' not to convict the defendant in this case, but simply as a circumstance for the jury as to whether or not the defendant did not have that 'bent of mind.' I will have to overrule the objection." The witness was permitted to testify: "She went to the home of Hazel Murphy, with her parents' consent, the latter part of August. She went to Hazel Murphy's house with Homer Suber and Hazel Murphy. Reached Hazel Murphy's house near one o'clock at night. Sat down on the edge of the bed, slipped off her shoes, fell back and went to sleep. Was awakened by

Miss Murphy who had her hand over witness's mouth, and Mr. Suber's knees were pressing on her thighs, and that waked her up, and she struggled and got up from them. It was between two and three o'clock, between midnight and day. Don't know when it was exactly, but had an idea it was between three o'clock and daylight. When witness fell back and went to sleep her dress was down. When she woke up it was up about my waist. Hazel Murphy's hand was over witness's mouth while Homer Suber had his knees on part of her thighs, pressing on her thighs. After this happened she got up and sat down on another bed, there being two beds in the room. Next day witness slipped out of the house and wrote a note to Henry Adams, her sweetheart, who came and carried her home, and she made complaint.

Ground 5 avers that at the conclusion of the testimony of Dorothy Williamson the State introduced as a witness Mrs. Paul Bryan, who testified in behalf of the State, over objection the same as is set out in the preceding division, as follows: Homer Suber and Hazel Murphy came together to her house on Sunday about the 26th day of July, 1931; wanted witness and her husband to ride around with them. They agreed to go. "After we got started, whisky showed up. Homer had it. He was offering it to me and my husband, and all of us, Homer Suber, Hazel Murphy, and my husband drank it. We rode several miles before we stopped. Hazel got out and asked me to get out with her, which I did. I let my husband know what Hazel said to me. Homer was driving the car. We went to Hartsfield and then back to Chastain, where Homer Suber's store was. While there my husband appeared to be drunk. He was not as drunk as they thought he was. When Homer Suber drove up by the store at Chastain, they pretended to get out and go somewhere to eat, and Homer got out and took my husband over there, and Hazel and myself went in the store. Homer Suber came in the store. It was about ten-thirty or eleven o'clock on Sunday night. Nobody else was around, as I seen. Hazel and I had been in the store just a few moments before Homer Suber came in there. When he walked in there he asked me about these things, and I told him I would not. Asked about being with him. Asked me in the presence of Hazel Murphy to have sexual intercourse with him. She asked me to, in Homer's presence. When I refused he pushed me up against the counter, and I pushed him back and kept him off.

My husband walked in the store at that time, and Homer took him and carried him back to the car and wanted to give him some cigarettes and a coca-cola, and I went to the car then and told him what had happened, and Homer came back and attempted again, and my husband walked in and seen him with his arms around me. He had just put his arms around me when he walked in. I had already told my husband what he had done. When my husband walked in, Homer turned me aloose and stood back. He asked him did he know he was messing with his wife, and I walked out of the store, and he talked to Homer; so when I went back they were still talking. They talked and argued about around a half hour I reckon, and Homer refused it all the time. He never did own up. He was denying it all the time what I accused him of."

For assignment of error, "Movant avers that the inadmissibility of the evidence so admitted over his objections was beyond doubt, and avers that the trial judge erred in overruling movant's timely objection to the admission thereof and admitting and allowing said evidence to go to the jury. Movant avers and contends that its sole purpose was an effort by the State to prove an alleged separate and distinct offense against movant from the offense for which he was being tried, not connected with nor in any way whatsoever related to the offense for which movant was being tried, viz., the offense of rape upon one Katherine Parker. . . And that likewise the question of motive or intention was not involved in the case on trial." Further, that "the inevitable effect of this evidence was to prejudice the rights of movant in the minds of the jury, he being charged with the serious offense of rape; and he avers that said testimony did, as a matter of fact, operate to his prejudice and hurt in the minds of the jury." Movant further avers that "the court erred in holding that evidence should be admitted for the purpose of showing the 'bent of mind' of the movant, at the time it was alleged he committed the offense for which he was on trial, for the reason that the law permitting the proof of other offenses, which are related in some way to the one for which the accused is on trial, does not extend to such proof for the purpose of 'bent of mind,' but on the contrary such proof is only admitted in proper cases for the purpose of showing the identity of the accused, the intent for which the crime was committed, or the motive of the accused at the time of the alleged commission of the offense under investigation. Movant

avers and contends that the evidence was inadmissible, irrelevant, and highly prejudicial to him, and that the judgment of the court admitting it over his timely objection was harmful error, entitling him to a new trial, for each and every one of the reasons assigned."

Ground 6 avers that the State offered as a witness Miss Hilda Leverette. Before she began her testimony, movant objected to its admission, upon the ground that "the evidence of this witness so offered by the State, of a separate and distinct offense, not connected with the offense for which movant was being tried, there being no question as to the identity of the accused, and the question of motive or intent not being involved in the offense for which movant was being tried, the testimony of the witness was immaterial, irrelevant, prejudicial to the rights of the defendant, and inadmissible." The court overruled the objection, and ruled: "It is admissible to show the 'bent of mind,' not to convict the defendant in this case, but simply as a circumstance for the jury as to whether or not the defendant did have that 'bent of mind.'" The witness then testified: She was twenty years old. Homer Suber and Hazel Murphy went to her house to see her about the 4th of July. Hazel Murphy came to her house and she went back home with her. When witness went home with Hazel Murphy she saw Homer Suber at Chastain. That afternoon they went off together to Moultrie in Franz Aycock's automobile. Homer Suber was driving. "On the way back we stopped; the first time they stopped was on this side of Pavo. He went to bothering me, and we came on down on the first branch this side of Autreyville. He didn't say anything. He ran his hands all around under my clothes. Hazel Murphy didn't say anything then. I tried to get her to let's go on, and she wouldn't do it. Tried to get her to go on and leave him. She did not say anything, and I begged her to come on and let's leave him. She said she could not help it. He did not succeed in accomplishing his purpose at that spot. He drove the car away from there to the first branch this side of Autreyville before stopping again. It was then about eleven o'clock at night, or after. Well, he could not hold me by himself; and she held me then, and she pulled me over on the seat and held my hands and arms, put her hands over my mouth to keep me from hollering. Homer Suber tried to pull off my clothes, but he couldn't; so he held me, and she did. He succeeded in having sexual intercourse with me before he quit. I tried my best to get

away from him, but I couldn't. . . He caused me to bleed from that act, from my private parts. They did not say anything after he had accomplished his act. After it was over they carried me on up to her home."

In ground 7 "Movant avers that the court erred in that the court failed to charge, without request, that ·the defendant could not be convicted of the offense of rape upon the uncorroborated testimony of the female alone; and in not instructing the jury, in connection therewith, what would or would not under the law constitute corroboration. . . Movant contends that there was no evidence in the record or in the statement of the defendant which amounted to any legal corroboration of the testimony of Katherine Parker, the female alleged to have been raped." The movant included in this ground a statement of the testimony of the female alleged to have been raped.

After a careful review of the evidence of this witness we are satisfied that her testimony was corroborated by the evidence of her brother that she. made complaint two or three hours afterward, the first time that she saw him, and also in some respects by the testimony of Carey Cone, and especially that portion of his evidence in which he testified that the defendant had just completed the sexual intercourse with the female, and insisted upon the witness performing the same act. The testimony of Miss Williamson, Mrs. Bryan, and Miss Leverette, while admitted only for the purpose of showing scheme, plan, or "bent of mind" of the accused, was of such nature as to authorize the jury to find that the defendant's "bent of mind" was to have sexual intercourse with females at his own will whenever he felt thereto inclined; and therefore this would be as much corroborative of the charge of the female in this case as if the same testimony had been introduced in the trial of this or any other offense in revealing the identity of the accused if his identity was otherwise unknown. As the law does not fix the quantum of corroboration in any case where corroboration is required, but leaves entirely to the jury, if any corroboration is required, how much shall be necessary, we can not say that the testimony in this case was not sufficiently corroborated. This being true, that part of movant's assignment of error which "contends *that there was no evidence* in the record or in the statement of the defendant which amounted to any legal corroboration of the testimony of Katherine

Parker, the female alleged to have been raped," falls to the ground nd becomes valueless, because not supported by the record. Whether this was the reason upon which the court overruled and held this ground to be without merit, it is not our opinion that the court was required without request to charge the jury that the defendant could not be convicted of the offense of rape upon the uncorroborated testimony of the female alone. This charge would not have been adjusted to the evidence, since it appears that the testimony of the female was corroborated to the extent we have stated. In the state of the evidence, to have given the charge which the movant contends should have been delivered would have been extremely misleading and confusing to the jury, if it had not been construed by the jury as an expression of the judge's opinion that there was no testimony before them which in any wise corroborated the testimony of the prosecutrix. This assignment of error is also incomplete, because the court was not told what portion of the law constituting corroboration the movant desired to be given to the jury, in case his contention that the testimony of the female was *uncorroborated* was in fact true. In other words, if the testimony of the female alleged to have been raped was entirely uncorroborated, would not an instruction that the jury could not convict the defendant of the offense of rape if her testimony was uncorroborated be sufficient of itself to require an acquittal of the accused, and would not any charge upon the rule by which corroborative evidence is to be considered be superfluous? It certainly would be superfluous and useless, unless we assume that the jury were so ignorant of the meaning of plain English words that they did not understand the meaning of the word "uncorroborated." Speaking for myself only, I think a jury can be fully authorized to return a verdict against one who violently and forcibly, and against her consent, commits upon her the offense of rape, or assault with intent to rape, even though there be lacking that corroborative evidence so strongly demanded by Sir Matthew Hale and adopted by Sir William Blackstone. *Johnson* v. *State,* 160 *Ga.* 77, 79-81 (127 S. E. 285).

In ground 8 complaint is made of the following charge: "The judge instructs you in respect to the evidence and the rules of law, with respect to the testimony of an accomplice in any given case; that is, the evidence of one who is an accomplice is admissible and relevant and competent; but in order to justify a verdict of guilty

upon the evidence of an accomplice, the evidence independent of that of the accomplice must connect the accused with the commission of crime charged and lead to the inference of his guilt, in order to warrant and justify a verdict of guilty, when the testimony of the accomplice is admitted in connection with the other evidence in the trial of the case." The complaints are that this charge was not adjusted to any evidence in the case, the evidence failing to show that any witness who testified for the State ever counseled, abetted, or in any manner whatsoever aided the defendant in the alleged perpetration of the offense. The movant sets out the testimony of Katherine Parker, and of Carey Cone, and "avers and contends that in view of the foregoing testimony, which was all of the material testimony relating to the alleged rape of the female on the front seat of the automobile, that this charge was harmful and prejudicial error. The State's witness Carey Cone, whom the court treated as an accomplice, had sworn positively that he was present at the time the prosecuting witness, Katherine Parker, testified the act was committed, and testified positively that no such act as that claimed to have been committed by her was in fact ever committed. Movant further contends that the testimony of Katherine Parker was in serious conflict, and that the facts she related were so highly improbable that the falsity of her testimony was manifest upon the face of it, and in itself sufficient to justify a reasonable doubt as to the guilt of the accused. Movant contends that he was entitled to have the benefit of the testimony of the witness Cone, which was highly beneficial to him and was sufficient in itself, not only to have generated a reasonable doubt as to his guilt, but would have entitled him, if the same were believed by the jury, to an acquittal." An examination of the evidence does not sustain the contention of the movant.

It is also contended that the charge just quoted was unauthorized, because there was no evidence that Cone, who was jointly indicted with movant, was an accomplice of Homer Suber; it not appearing from the evidence that Cone, though present, ever counseled, aided, or abetted Suber. As we construe the evidence, and as we think the jury had the right to construe it, the complaint that the instruction was not adjusted to the evidence is without merit. The Penal Code, § 44, defines an accomplice as "one who is not the chief actor in the offense, nor present at its performance, but is some way concerned

therein, either before or after the act committed." Under the proof, it was the duty of the jury to consider not only direct testimony but circumstantial evidence; and there are numerous circumstances which would have authorized a jury to reach the conclusion that both Suber and Cone were actors with the common intent that Suber should have sexual connection with Katherine Parker forcibly, if it could not be accomplished peaceably. We do not say that a finding to that effect was demanded, but it can be safely asserted that such a finding beyond a reasonable doubt would have been authorized. In that view of the case, it is not made to appear how Suber was hurt my Cone being classified, even erroneously, as an accomplice. In our opinion, it is an instance where error and injury do not so concur as to require another trial as matter of law. If, as insisted, Cone was not an accomplice, the contention that the court should have told the jury "what an accomplice was, so as to enable them to determine for themselves" whether Cone or any witness in the case was an accomplice, would have presented an issue not within the scope of the evidence, with the result that such instruction would have been misleading and confusing to the jury. The error, if any, was harmless.

In ground 9 error is assigned upon the admission, over movant's objection, of testimony of Katherine Parker, to wit: "At the time I made complaint to my brother I had with me the clothing which I had worn the night before. I showed to him. They were bloody, looked like, as they possibly could be." This testimony does not disclose that the female said anything to her brother at the time she "made complaint," in violation of the principle announced in *Lowe* v. *State*, 97 *Ga.* 792. The rule stated in the *Lowe* case has been followed in numerous cases, but its purpose is to prevent the bolstering up of the prosecutrix's testimony on the stand by previous self-serving declarations which might come from far more credible mouths than that of the prosecutrix herself. But, from the testimony to which objection is made in this case, the jury could not possibly ascertain what language was used in making the complaint to her brother when she "made complaint." As the testimony shows, the brother had been with her and discussed with her the advisability of his giving her permission to go to a party with Suber and Miss Murphy, and that she left without changing her clothing. The witness did not say that she told her brother anything about

the clothing or its condition at the time she made the complaint. All she said to the jury, in connection with her complaint to her brother, was: "I had with me the clothing which I had worn the night before." She did not say that she told her brother, as she showed the clothes to him, that they were bloody; but in the testimony complained of she swore to the jury, as a fact, that the clothes she showed to her brother were the clothes she had worn the night before, and that at the time she showed them to her brother "they were bloody, looked like, as they possibly could be." Movant contends that "the exhibition by the female alleged to have been raped, to her brother, of said clothing claimed by her to be the clothing which she was wearing at the time of the alleged rape, was a detail or particular of the alleged criminal act; and to permit the female to testify that in her complaint to her brother she exhibited to him the clothing which she claims to have been wearing at the time would be permitting the State to prove the criminal act by mere hearsay testimony." As we have already pointed out, the language in which the female testified to the jury that she made complaint to her brother can not be strained to mean more than that at the time she made the complaint she showed him the clothing which he had seen her have on the night before. The fact that she testified at the trial that these clothes were bloody, etc., was no part of the complaint, so far as appears.

The general grounds of the motion do not require the grant of a new trial. The record discloses a very unusual condition. It presents an instance of a female co-operating with a male in the commission of the crime of rape upon one of her sisters in sex. There have been previous instances, both in history and in the proceedings of courts, when the rape of the woman was effected, not only by participation of two males—for the gratification of fiendish lust, but in at least one notable instance the rape of a nobleman's wife (though the forcible intercourse was effected by one of his retainers in his presence and at his procurement) was judicially punished by the death of the husband. So the fact that an offense may be unusual or abnormal does not compel a jury who are fair and impartial to discredit and disregard entirely any witnesses who in their opinion are entitled to be believed.

*Judgment affirmed. All the Justices concur.*

ATKINSON, J., concurs in the judgment, but not in all that is said in the opinion.