## MELTON *v.* THE STATE.

No. 11714. APRIL 16, 1937.

*George P. Munro,* for plaintiff in error.
*M. J. Yeomans, attorney-general, A. J. Perryman* and *Hubert Calhoun, solicitors-general, B. D. Murphy,* and *E. J. Clower,* contra.

BECK, Presiding Justice. Eli Melton was convicted on an indictment charging him with the offense of rape upon the person of Miss Wiletta Carlisle on February 13, 1936. The jury did not recommend mercy. The defendant made a motion for a new trial on the general grounds, and on four special grounds. The motion was overruled, and the defendant excepted. The evidence for the State showed substantially the following facts: On February 13, 1936, Miss Carlisle and a young man to whom she was engaged to be married, named James F. Etheridge, were together in Etheridge's car and rode out to the city waterworks of Columbus. They had just parked the car and were preparing to get out of the car and get some water, when a man, armed with a pistol, walked up to the car and ordered them to get out. This man was identified on the trial by both Etheridge and Miss Carlisle as Eli Melton. Keeping them covered with his pistol, Melton forced Etheridge to get in the car and drive, stating that he was going to take them to the police station. Instead of taking the road leading back into Columbus and to the police station, Melton ordered Etheridge to turn off on a side road; and after driving several miles into the country he made Etheridge and Miss Carlisle get out of the car, walk ahead of him over some rough country and into the woods, and then, while he kept his gun pointed at Etheridge, whom he ordered to place his arms upon the limb of a tree and keep them there, Melton forced Miss Carlisle to lie down, and he threatened to kill her if she did not submit to him. Miss Carlisle struggled with Melton; but he being a powerful man and having threatened to kill her with the pistol, she was compelled, through fear and physical force, to lie down, and the defendant committed the offense of rape upon her. After he completed this act, he instructed Miss Carlisle not to tell Etheridge what had happened, stating that if she did he would kill her. On the following day she was examined by Dr. W. P. Jordon, who found that her hymen had not been ruptured, but that she had three distinct bruises on the outside of the hymen, on the inside of the vagina. This doctor testified: "There has been a penetration about a half an inch."

Two police officers, W. C. Webster and H. J. Willis, were permitted to testify over the objection of counsel for the defendant that such testimony was prejudicial, irrelevant, and immaterial, in that it related to a separate and distinct charge. Webster tes-

tified that he and another police officer named Davidson, in company with two young ladies, were seated in a Ford sedan near the waterworks on the night after the crime here charged, when a person answering the description which had been given them by Etheridge walked up to the car and asked Davidson for a match. Davidson was sitting in the front seat, and Webster was in the back seat. Neither of the officers had on their uniforms. After Davidson told the man (whom the witness identified on the trial as the defendant Melton) that he did not have a match, Melton walked back and asked Webster for one. Webster asked the defendant what his name was, and he made no reply, but stepped back from the left side of the car about two or three paces and pulled a gun out of his rear pocket. Webster had his gun already drawn, and when Melton pulled his gun Webster shot him in the face, and Melton ran off into the woods, Webster shooting after him four more times. H. J. Willis, of the county police force, testified that on that night he and the chief of police, Satterfield, stationed themselves near the waterworks. They heard some shooting; and when they went to the place Webster told them what had occurred, and that he had shot a man. Willis, with the other officer, took a stand to look out for the man described by Webster. When somebody's automobile flashed a light, the witness saw the shadow of a man. He shot, and the man jumped behind a tree. Witness shot again, and the man threw up his hands and said, "I give up." It turned out to be the defendant, Melton, who was shot on the cheek.

The defendant set up the defense of alibi, and produced several witnesses, most of whom were members of his family, who testified to the effect that about the time the crime here charged was alleged to have been committed, he was at the home of his mother.

In addition to the general grounds, there are four special assignments. In the first of these, error is assigned upon the admission in evidence of the following testimony of Webster, a witness for the State: "I saw Mr. Etheridge the following night on the fourteenth day of February. I saw him that night. My brother officer and I continued our search for this man. The next time I saw Mr. Melton was the night after this affair happened in the waterworks woods. When I first saw Mr. Melton he was walking

through the woods, headed towards the pump-house in front of the waterworks office. At that time he didn't do anything, but I didn't recognize him at that time as being the one. I saw a man of that description through there, but the first time I saw him to recognize him he came up to the side of the car where I was sitting in the waterworks woods that night. Mr. Davidson and myself were seated there in a Ford two-door sedan. I was sitting in the automobile, and he walked right up by the side of the car, standing there talking to us, his face right in the edge of the car. He walked up to the car and asked us for a match—asked Mr. Davidson for a match. Mr. Davidson was sitting in the front seat, and I was sitting in the rear seat. We did not have on our uniforms. We had put ourselves there purposely without uniforms. He walked to the car, and as he walked from a little road up towards the car another man was with him. I noticed them walk up for some little distance, and they walked from the car as far as from where we are sitting to the table there, and the other man stepped behind a large tree. Mr. Melton continued on to the car where we were sitting. In the meantime, Mr. Davidson and myself were sitting down there with two girls. Mr. Davidson was under the steering-wheel and a girl on his right, and I was in the rear of the car with a girl on my left, but as Mr. Melton walked to the car he asked Mr. Davidson for a match. He approached on his side, and he told him he didn't have one. He walked back to the back and asked me for one. He walked back to the back of the car and looked around when I told him I didn't have one. I watched him right close. He came along the side of the car, came back and looked at it slowly and carefully. He says, 'Well, I just wanted a match,' but I recognized him when he first reached the car; so I asked him what his name was and he didn't reply anything to that, but stepped back from the left side of the car for about two or three paces, and as he stepped back I kept my eye on him very close, and he pulled a gun out of his rear pocket. It was a pistol, dark-colored pistol. I couldn't say exactly the caliber, or anything like that. I could see the barrel of it very plain. He pulled the pistol out of his pocket and pointed it at us. Pointed it directly at the car—at Mr. Davidson and, myself and the two young ladies sitting in it. As he got it up here I had my pistol in my hand, and I shot him. I shot him one time, and after I

shot him once I didn't see him any more, but I shot four more times in the direction, for I thought he was due to do some more shooting. I couldn't see him then after I shot the first time. I was not able to arrest him at that time. That was between nine-thirty and ten. The reason for our being there with the two young ladies, trying to catch whoever it was that had been doing hold-up jobs in the waterworks woods. We had deliberately planned that to catch them. He was arrested approximately thirty minutes after the shooting occurred that I have just explained. He was arrested about a quarter of a mile from where the shooting occurred, in the waterworks woods directly on the river road, right at the edge of the river road, approximately the place where he was supposed to have left Mr. Etheridge's car the night before. Chief Satterfield was up in that vicinity, but he wasn't with us at the time he approached the car. Mr. Willis and Mr. Davidson arrested Mr. Melton. Mr. Davidson was the man who was with me at the time I shot Mr. Melton. I saw him that night after he was arrested, at the City Hospital. I had hit him. He was shot in the left side of the face. At the time the shooting occurred and it was over with, Chief Satterfield and officer Willis came down to the scene where the shooting was. After I had shot him, Chief Satterfield and Mr. Willis went back to the river road and stopped over on the pavement. Mr. Davidson and I rode out and rode up the river road. We didn't see anybody. We went up the road and came back where Mr. Satterfield and Mr. Willis was. I left Mr. Davidson stationed on the river road just a short distance from where he was finally arrested, and Mr. Satterfield and I went to his house or one of his brothers' house where we thought he lived, and when I knew he had been arrested Mr. Willis came up for us. They arrested him coming out of the waterworks woods. He didn't come home. It was between the scene of the shooting and the house where we were." The second assignment of error was on the admission of similar testimony given by H. J. Willis.

The court properly admitted this evidence. While it related to a transaction different from that for which the accused was on trial, yet it was admissible, because it tended to illustrate the bent of the defendant's mind, his plan and scheme, and to illustrate them in such a way as to throw light on the charge made against

him in the indictment, and to identify the accused as the perpetrator of the crime. In *Merrill* v. *State,* 168 *Ga.* 753 (149 S. E. 46), it was said: "The manner of committing the crime, the location, the circumstances, are all such as to authorize a jury to believe that all were committed by the same man. Merritt was identified as that man. All were in the same neighborhood; two of the three acts were committed in the same alley; in each of the three instances the criminal used a pistol and a flashlight," etc. It was held that evidence relative to other acts of violence committed by the defendant, who was being tried for rape on other women, was admissible over the objection that such testimony related to separate and distinct crimes. The court said: "The evidence here offered was admissible to show plan, and to identify the defendant as the perpetrator of the crime." The evidence which was objected to is very lengthy, covering two or three pages, and under the ruling cited above certain portions of this were admissible. No special part of it was objected to, but the objection to it was as a whole; and where a part of the evidence objected to as a whole is admissible, and no particular portion is pointed out, the judgment will not be reversed for the ruling admitting the evidence. For other cases in our reports showing rulings similar to that in the *Merrill* case, supra, see *Wilson* v. *State,* 173 *Ga.* 275 (160 S. E. 319); *Haden* v. *State,* 176 *Ga.* 304 (168 S. E. 272); *Suber* v. *State,* 176 *Ga.* 525 (168 S. E. 585). The court declines, upon review, to overrule these decisions.

The rulings made in headnotes 2 and 3 require no elaboration.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., who took no part in the opinion or the judgment.