## GEORGE DUNSCOMBE v. STATE.

No. A-3637.　Opinion Filed May 21, 1921.
(197 Pac. 1073.)

(Syllabus.)

1. **Rape—Assault With Intent to Rape—Evidence—Former Acts of Accused.** In a prosecution for assault with intent to rape, former acts of defendant of the kind committed on the prosecutrix are relevant on the issue of intent, but such occurrences must be closely related in point of time to that upon which the prosecution is based in order to avoid the objection that defendant has been unfairly surprised.

2. **Same—Remoteness of Former Acts.** It is manifestly unfair to defendant to permit such evidence to be introduced in rebuttal where the nearest of such alleged separate and distinct acts of immoral conduct with other females occurred in point of time nine months prior to the commission of the alleged offense and under circumstances wholly dissimilar.

3. **Same—Appeal—Reversible Error.** Where the evidence of defendant's guilt of the crime of assault to rape is weak and unsatisfactory, the admission in rebuttal of evidence of alleged separate and distinct acts of immoral conduct, occurring in point of time from nine to fifteen months prior to the commission of the alleged offense, is held to be reversible error.

Appeal from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

George Dunscombe was convicted of the crime of assault with intent to rape, and punishment assessed at imprisonment in the county jail for a period of sixty days, and appeals. Judgment reversed.

Scothorn, Boardman & Withington, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

MATSON, J. George Dunscombe was convicted in the district court of Oklahoma county of the crime of assault with intent to commit a rape, alleged in the information to have been committed on one Ruth Lowe, a female under sixteen years of age, about the 16th day of February, 1919.

In substance, the testimony is about as follows: Ruth Lowe, the prosecuting witness, testified that she was fifteen years of age on the 3rd day of February, 1919; that on the 16th day of February, 1919, she, together with her aunt, Alma Roberts, was rooming with defendant and his wife on West Third street in Oklahoma City, and had been rooming there since the 24th day of December, 1918; that on the 16th of February, 1919, which was Sunday, witness and her aunt slept together in one room of defendant's home, while defendant and his wife slept on a sleeping porch; that about 7:15 on that morning, witness went to the sleeping porch and awakened defendant and his wife, after which she returned to a room adjoining the one in which she and her aunt had been sleeping and sat down by a stove. Thereafter, defendant came into the room, and she and defendant then went into her room.

As to what occurred then, witness testified as follows:

"Q. When was the first time you saw Mr. Dunscombe that morning, if you remember? A. About eight-thirty, I suppose. Q. What was he doing, if anything? A. Nothing. Q. Where was he at? A. He was—when I first saw him he was in his room. Q. When was the next time you saw him? A. He came in my room the next time. Q. About what time was it he came into your room? A. About eight-thirty. Q. What did he do, if anything, when he came in your room? A. He came in and got in bed there. Q. Who was in bed, if anybody? A. My aunt was there at first. Q. Were you in your night clothes or were you dressed? A. No, sir; I was not dressed. Q. What did he do, if anything, when he got in bed with you? A. My aunt got out and he grabbed me and I tried to get away from him and began to scuffle and he pinched me on the breast. Q. What else did he do, if anything? A. He pinched me on the limbs and breast and I scuffled and tried to get away from him and we scuffled for quite a while. Q. Did he at that time or any other time make any threats toward you? Mr. Boardman: That's objected to as incompetent, irrelevant, and immaterial; leading and suggestive.

"The Court: Overruled.

"Mr. Boardman: Exceptions.

"Yes, sir. Q. What did he say? A. He told me to not tell it. Q. What was it? A. He told me I had better not tell it. Q. What did he say about the reason, if any? A. He did not give any reason only I had better not do it. Q. Did he say anything with reference to what he would do with you if you did tell it? A. He said there was no telling what he would do. Q. Did you believe that? A. Yes. Q. Had he ever attempted to do as he did that morning any time prior to that day? A. Yes. Q. When was it, if you remember? A. When we would be in the front room and at his office. Q. How many times if you know at his office did he attempt to do these things? A. I don't know. Q. What did he do at his office, Ruth? A. When I would go in sometimes he would grab me and pinch me and scuffle and when I would pass him in the front room he would pinch me on the hip. Q. Did he ever put his hands under your clothes? A. Yes, sir. Q. Did you make any objection to that? A. Yes, sir. Q. What would he say? A. He would just scuffle with me and try to hold me. Q. Did you ever tell anybody what Mr. Dunscombe had done toward you? A. No, sir. Q. Until after the information was filed? A. No, sir. Q. What was the reason? A. Because he told me not to and I was afraid to. Q. Did you ever tell your aunt anything about it? A. No, sir. Q. How long did you stay in the room after Mr. Dunscombe came in your room on Sunday, February 16th? A. About 15 minutes, I suppose. Q. During this time was he in bed with you? A. Yes, sir. Q. With reference to how the covers were in the bed, were they off of you or were they over you? A. They were on the bed but they were just all mixed up. He came and got in and we were scuffling and we threw them off. Q. Was there anybody in the room during the time you and Mr. Dunscombe were in the room? A. My aunt went out and then we were alone. Q. Then I believe you said you were alone the rest of the time he was in there? A. Yes, sir. Q. Did he ever do anything besides pinch you on the breast and lower limbs and place his hand under your dress? A. Yes, sir; he has bit me lots of times. Q. Where? A. Bit me on the arms and on the limbs. Q. Where abouts did he bite you on the limbs? A. Below the knees when we were scuffling. Q. Any place else? A. No, sir. Q. Has he ever done anything else other than what you have related?

A. No. sir. Q. Did the threats Mr. Dunscombe made toward you cause you to be afraid of him? A. Yes, sir."

On cross- examination, prosecutrix testified in part as follows:

"Q. I understood you to say you had been to Mr. and Mrs. Dunscombe's room that Sunday morning before he came to your room? A. Yes, sir. Q. So you say that was some time before eight-thirty, you think? A. It was about seven-fifteen when I went to their room. Q. At that time can you tell the jury whether or not Mr. and Mrs. Alberry were in the house? A. No, sir, I don't remember which party were in the house. Q. There were some other folks in the house? A. Yes, sir. Q. At that time were Mr. and Mrs. Alberry renting rooms there at all? A. I don't think so; I think it was the other lady, Alma's friend. Q. You don't think that she had left then? A. No, sir. Q. Your recollection is that Mr. and Mrs. Alberry came there after this Sunday? A. Yes, sir; I thought it was them that was in there at that time but I don't believe it was now. Q. You think it was your aunt's friend? A. Yes, sir. Q. And Mr. and Mrs. Gardner were there? A. Yes, sir. Q. How did you happen to go there about the time you awakened up, seven-fifteen, and go to Mr. Dunscombe's room? A. Because Mrs. Dunscombe told me to call her when we got up. Q. When did she tell you that? A. That night. Q. Told you to call Mr. Dunscombe the next morning? A. Told me to call her the next morning. Q. She told you to call her the next morning? A. She told me the night before to call her the next morning when we got up. Q. How far from your room was Mr. and Mrs. Dunscombe's room? A. Theirs was just off the dining room on the sleeping porch and ours was off the front room. Q. On the same floor? A. Yes, sir. Q. Any upstairs to that house? A. No, sir. Q. When you got out of bed that morning did you put on any jacket or anything around you? A. Yes, sir. Q. Around your night clothes? A. Yes, sir. Q. What was it? A. I had on a bath robe. Q. A regular bath robe? A. Yes, sir. Q. Anything else? A. No, sir. Q. That was when you first got out of bed? A. Yes, sir. Q. Then I understand you went to Mr. and Mrs. Dunscombe's room and called them? A. Yes, sir. Q. What did you say to them? A. I told Mrs. Dunscombe to 'come on and

get up now,' is the way I said it. Q. What did she say? A. She said 'All right.' Q. Did Mr. Dunscombe say anything? A. I don't remember that he did. Q. Was he in the room? A. Yes, sir. Q. You are sure that he was in the room? A. Yes, sir. Q. You opened the door, did you? A. Yes, sir. Q. Did you go in? A. No, sir, not that morning. Q. You did not go in? A. No, sir. Q. Miss Ruth, at that time you did stay some of the nights in the room occupied by Mr. and Mrs. Dunscombe, was that the night your aunt was out and you was there? A. Yes, sir. Q. And you and Mrs. Dunscombe were both in bed and you got in bed with them a while? A. Yes, sir. Q. And that was all there was to that? A. Yes, sir. Q. When was that as compared to this Sunday, February 16th, was that the day before you speak of, this Sunday you mentioned? A. Yes, sir. Q. About how long before? A. About a week or something like that, I don't remember the date. Q. Mrs. Dunscombe was still in bed when you left that night, was she? A. Yes, sir. Q. Now, after you had called Mr. and Mrs. Dunscombe that morning, Sunday, February 16th, did you, in going from your room to their room, did you see anybody else in the house? A. No, sir. Q. Mr. and Mrs. Gardner, or the other lady? A. No, sir; they were not up yet. Q. The house was quiet at that time? A. Yes, sir. Q. Then did you go back to your room? A. Yes, sir. Q. Was your aunt in bed then? A. Yes, sir. Q. You got back in bed with her then, did you? A. Yes, sir. Q. Then did Mr. and Mrs. Dunscombe come into the room after that? A. I got up and went out in the front room and Mr. Dunscombe came out there and be began to pick at me and we began to scuffle, and I run into my room and he came and my aunt went out. Q. Where was Mrs. Dunscombe at that time? A. She came to the door of our room for a few minutes and then she went back and dressed. Q. After you had gone back to your room, after having called Mr. and Mrs. Dunscombe, did they get right up? A. Yes, sir. Q. And then did they come to your room? A. Yes, they came to the front room. Q. Both of them? A. Yes, and Aunt Alma had not got up, and Mrs. Dunscombe began to talk to her and Mr. Dunscombe— Q. (Interrupting) I can't hear you, little girl, what I asked you was after you had gotten up that morning and called Mr. and Mrs. Dunscombe, they got

up soon, did they? A. Yes, sir. Q. They got up pretty soon after you called them? A. Yes, sir. Q. And then I understand that both of them came into where you and your aunt were? A. Yes, sir. Q. Were you out of bed at that time? A. Yes, sir. Q. Which room were you in, the sleeping room, or had you gone into the next room? A. I was sitting in the front room. Q. That is where the stove is? A. Yes, sir. Q. Had you been back to bed at all or had you just sat down? A. I had been back to bed and I decided to get up and my aunt had not got up yet. Q. Did you still have on your bath robe? A. Yes, sir. Q. You had gone from your bedroom to the sitting room? A. Yes, sir. Q. Is there a door that leads from that room to the bedroom? A. Yes, sir. Q. And your aunt was in the bedroom in bed? A. Yes, sir. Q. Then I understand you and Mr. Dunscombe had some scuffling? A. Yes, sir. Q. You and Mr. Dunscombe had scuffled some before that a good many times? A. Yes, sir. Q. Do you recollect prior to that time having hid his glasses? A. Yes. Q. At night when he wanted to read a paper? A. Yes, sir; in a playful way, is all. Q. And you played back and forth with him and hid his paper? A. Yes, sir. Q. And sometimes during the evening you would scuffle with him too? A. Yes, sir. Q. Do you recollect of jumping on him once and tearing a hole in his trousers with your shoe? A. Yes, sir; one evening when I was trying to get away from him. Q. Is it not true a great many times when you and Mr. Dunscombe would scuffle around the room that lots of times you would start it by teasing him? A. Sometimes Mrs. Dunscombe would say 'Go and hide his paper,' and I would, and he would grab me and that is the way it would start. Q. Lots of times it would start just that way? A. Yes. Q. When you were scuffling up there in the room that Sunday morning after Mr. and Mrs. Dunscombe came in, did Mr. Dunscombe have on a bath robe? A. No, sir. Q. Are you sure of that? A. Yes, sir. Q. How long did you stay in that front room after Mr. and Mrs. Dunscombe came in? A. He began to pick at me and then said, 'I am going to go and get Alma out of bed,' and she hollowed for me and then she got up and then he grabbed me, and I tried to get away from him. Q. That was all a part of the same scuffling, was it not; just a continuation of your scuffling? A. No, sir; when he would pinch me like that I would try to

get away from him.  Q.  When Mr. Dunscombe did go in the bedroom your aunt was in bed?  A. Yes.  Q.  Did she say anything?  A.  She said, 'You had better get out of here,' that she wanted to get up.  Q.  Is that all that you can remember that she said?  A. Yes; but when he started to get in bed she said, 'Well, you can just have the bed then,' and she went out in the front room and she and Mrs. Dunscombe were out in the front room.  Q. Miss Ruth, did Mr. Dunscombe, after you were scuffling with him in the sitting room where the stove was, just off the bedroom with the door open and your aunt in bed, did you and Mr. Dunscombe go back where your aunt was, both at the same time, or did he come after you?  A.  He went in and said he was going to get Alma out of bed, she hollowed, and I ran in and jumped in bed back of her, and then he got in and she got out.  Q.  Were the covers over your aunt at that time?  A. Yes.  Q.  Did you get under the cover?  A. Yes.  Q.  In back of her?  A. Yes.  Q.  And Mr. Dunscombe came in and he got in with you?  A. Yes.  Q. Had you been still scuffling?  A.  No, sir; I had not been; when he came in there I quit.  Q.  Didn't he try to pull the covers off of your aunt?  A. Yes, sir.  Q.  What did he say to her?  A. I don't remember, but when I got in he got in and then she got out and said, 'Well, you can just have the bed,' and then he grabbed me.  Q. That was all your aunt said to him that you remember?  A. Yes, sir.  Q.  I understood you to say that Mr. Dunscombe stayed in there in the bed several minutes, is that true?  A. Yes, sir.  Q.  What did you say to him during that time, if you can remember?  A.  I don't remember, but I told him to let me alone, and he would not, and then was when he pinched me on the breast.  Q. What did he say?  A.  He said he would never let me go.  Q.  Did he say anything else?  A.  Not that I remember, but I kept trying to get away from him.  Q.  As near as you remember, did he say anything else that you have not related? A. He asked me—as we were scuffling and I was trying to get away from him and he would not let me go and I hollowed for Aunt Alma—  Q. That was when you were in the sitting room?  A. No; we were in the bed.  Q. What did he say? A. He said, 'Keep still,' when I hollowed for Aunt Alma. Q. Anything else?  A. No, sir.  Q. You cannot remember

anything else? A. No, sir. Q. You did get out of bed, didn't you? A. Yes. Q. Was Mr. Dunscombe in the bed when you got out? A. Yes.''

M. C. Gardner, the only other witness used by the state to prove the case in chief, testified that on the 16th day of February, 1919, he and his wife were rooming with defendant in a room adjoining that occupied by the prosecuting witness and her aunt; that on said morning at about 8:30, he observed defendant in the room with prosecuting witness while peeping through a crack in the door between their two rooms; that he saw defendant sit down on the bed and then lay over on the bed, then witness did not look any more, but just listened for a while, and heard prosecuting witness hitting defendant on the back and saying, "Daddy, quit that." Defendant seemed to be in the room fifteen or twenty minutes. On one occasion prior to that, he had seen prosecuting witness coming out of defendant's room about 11:30 at night. On the occasion that he saw defendant in prosecuting witness' room on February 16th, both seemed to be dressed in their night clothes.

Defendant testified in substance that he was 56 years of age, was in the real estate and oil business; that prosecuting witness and her aunt came to stay at their house, about Christmas, 1918, and stayed until the 26th of February, 1919; that another lady and a little boy had another room rented in defendant's home; that the little boy was about two years old, and that defendant would frequently play with him and the prosecuting witness; that prosecuting witness would sometimes steal defendant's newspaper and hide it, and also his reading glasses, and defendant would scuffle with her at times in trying to get such things back; that on one occasion the prosecuting witness came and got in the bed with defendant and his wife, but was on the outside of the bed on the other side of defendant's wife; that on the morning of February

16th, prosecuting witness got up earlier than defendant and his wife did, and came and called them, and defendant's wife went out into the kitchen to get breakfast and told prosecuting witness to get "Daddy and Alma up for breakfast," (referring to defendant and prosecuting witness' aunt); that prosecuting witness then came in and started to pull the covers off of defendant's bed, and defendant's wife also came in and helped prosecuting witness, and they pulled the covers off of defendant and pulled defendant out of bed; that defendant then got up and went in the front room to put on his shoes; that the door was open between that room and the room in which prosecuting witness' aunt was sleeping; that defendant was wearing a big cotton flannel sleeping robe; that prosecuting witness came in and said, "Let's pull Alma out of bed," referring to her aunt: that defendant and prosecuting witness then went into the room and started to pull Alma out of bed; that defendant jumped over on the back edge and started to kick Alma out with his feet; and prosecuting witness jumped in between them and helped kick her aunt out of the bed; that defendant then turned and pushed prosecuting witness out of bed, covers and all; and that was all he did on the occasion; that he did not in any way attempt to have sexual intercourse with the prosecuting witness, and never had any such intention; that in pushing her out of bed he might have taken hold of her, but didn't know whether in doing so he pinched her or not; that he never told prosecuting witness not to say anything about it; that prosecuting witness and her aunt ate breakfast with them that morning; that no reference was made to this occurrence; that they stayed in his home for ten days after that, and were on apparently perfectly good relations with him, and that he didn't know anything about any trouble until after he was arrested; that prosecuting witness had frequently jumped on his back and had ridden him around the house in a playful way, and he thought

nothing more of it than he would if she had been his own child; that prosecuting witness was a very playful child, and liked to scuffle.

On cross-examination, the state was permitted to ask defendant concerning certain alleged acts of immoral conduct of a similar nature occurring with other females in defendant's office on three different occasions, ranging in time from about nine months to fifteen months prior to the alleged commission of this offense. Defendant denied each of these occurrences. In rebuttal the state was permitted, over objection and exception of defendant, to introduce witnesses to prove these alleged occurrences. The action of the trial court in permitting the admission of such evidence in rebuttal forms the basis of the main contention of counsel for a reversal of this judgment.

The authorities are divided on the question of whether evidence of other acts of alleged misconduct of a similar nature is admissible in a case of this kind for the purpose of proving intent. The better reasoned authorities, in our opinion, are to the effect that such evidence is admissible for that purpose with proper limitation as to the time of such occurrences, in order to avoid the objection that defendant has been unfairly surprised. Wigmore on Evidence, section 357.

The evidence in this case as to defendant's guilt of the crime for which he was convicted is very slight; in fact, without the evidence introduced in rebuttal of the other alleged acts of immoral conduct with other females, there is practically no evidence which indicates intention on the part of defendant to rape the prosecuting witness on the Sunday morning. February 16th. Certainly the witness Gardner, who was in the adjoining room and saw defendant on the bed with prosecuting witness, apprehended no intention of defendant to rape her, or else he would have broken through the slight

partition which separated him from them. The wife of defendant and the aunt of the prosecutrix were also in the house at that time, and knew that defendant was in the room with prosecutrix. Neither of them was used as a witness in this case. Why the aunt of the prosecutrix was not used by the state does not appear. She and the prosecutrix ate breakfast with defendant that morning after it is alleged he attempted to assault prosecutrix, and also stayed at their house for ten days thereafter, and during all of that time prosecutrix made no complaint to her aunt or to anybody else, and thereafter ran frequent errands for defendant and his wife, and also made trips to defendant's office unaccompanied. Prosecutrix attempts to explain her conduct in this respect by stating that defendant told her that if she told about it there was no telling what he would do, but the conduct of the prosecutrix and those who were present in the house clearly indicates a lack of belief on the part of all of them that defendant assaulted the prosecutrix with any criminal intent at that time.

In view of the weak and unsatisfactory nature of the evidence of the guilt of defendant of the particular offense of which he was convicted, we think it was manifestly unfair to him to permit evidence to be introduced in rebuttal to these alleged separate and distinct acts of immoral conduct occurring with females other than the prosecutrix, the nearest of which in point of time occurred nearly nine months prior to the commission of this alleged offense and under circumstances wholly dissimilar. Evidence of this character when admissible should be used in chief. The state should not ambush defendant and in effect unfairly surprise him by waiting to introduce such evidence in rebuttal.

While it would be discretionary with the trial court to permit its introduction in rebuttal, we think its admission in this case under the circumstances was clearly an abuse of dis-

cretion on the part of the trial court and prejudicial to defendant, and deprived him of a fair opportunity to meet an issue which should have been presented in chief.

The fact that the jury only assessed a punishment of sixty days in jail for an offense which in its nature, if true, is so heinous as to demand at least a penitentiary sentence, is persuasive that even with this unfair rebuttal testimony the jury had some doubt of the guilt of defendant of any intent to ravish the prosecutrix.

If defendant is guilty of the offense charged, a punishment of sixty days in jail is ridiculous, uncalled for, and amounts to a prostitution of justice; if defendant is innocent, he should be acquitted. In any event the issue should be presented to another jury in an orderly and legal manner, so that defendant may have a fair opportunity to meet in his defense all the issues bearing on the material ingredients of the crime, which should have been presented in the state's case in chief.

The Attorney General has filed a confession of error in this case, admitting that the evidence of other alleged assaults was improperly introduced in rebuttal, and expressing the opinion that the judgment of the trial court should be reversed.

For reasons stated, the judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

DOYLE, P. J., and BESSEY, J. concur.