Delmer STEVENS, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12350.

Criminal Court of Appeals of Oklahoma.

Sept. 12, 1956.

Rehearing Denied Oct. 24, 1956.

Tom Smith, Walter Billingsley, Wewoka, J. Russell Swanson, Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error, Delmer Stevens, defendant below, was charged by information in the District Court of Garfield County, Oklahoma, with the crime of first degree rape, 21 O.S.1951 §§ 1114, 1115, of Mrs. Mary Lou Black, the mother of three children, two girls 12 and 9, and a boy 11, the crime allegedly being committed on October 3, 1955. The defendant was tried by a jury, convicted, his punishment fixed at 15 years in the penitentiary, and judgment and sentence were entered accordingly from which this appeal has been perfected.

At the time the within cause was set for oral argument, on July 16, 1956, no briefs were filed and no appearance was made. The case was therefore submitted on the record. Under such conditions, we examine the information and evidence to see if they support the verdict, judgment and sentence, and the instructions to see if they correctly state the law; and where we find no fundamental error, the conviction, judgment and sentence will be affirmed. Dunnam v. State, Okl.Cr., 282 P.2d 778, and cases cited therein. Such is the situation in the case at bar.

An examination discloses that the evidence herein amply supports the conviction. Briefly, the facts, as found by the jury, disclose that for a considerable time prior to

October 3, 1955, the defendant, though married, had an undisclosed infatuation for Mrs. Black. During that time he observed her at her home in Enid, Oklahoma, through her windows at night so closely that he told her he could even tell her when she had her menstrual periods and that she was alone with her children. Mrs. Black, it appears, may have talked to him about a week before the alleged criminal assault, when the defendant made inquiry of her little boy in the front yard concerning a supposed address in the vicinity. Mrs. Black's son called his mother, who, while standing in the front door, had a short conversation with the defendant in regard to the same. However, she did not remember the defendant or his identity from the conversation, since it was late in the evening and he did not come up on the porch but stood out in the yard. It appears that the defendant was conversant with the house's interior and the arrangement of the furniture, since he had no difficulty in his movements about the same on the night in question, October 3, 1955, even though the furniture was crowded and it was about 2:30 A.M. and quite dark.

At this hour of the early morning, Mrs. Black and her three children were alone, her husband being away. They were asleep in the bedroom, when the defendant, having forced his way through the kitchen door, suddenly appeared at the side of Mrs. Black's bed, when she awoke. The defendant, she testified, said: "Don't move, or don't scream, or I will kill you." Mrs. Black related it seemed her breath left her and her heart stopped beating and she was numb for a minute. The defendant reached up and pulled down the blind. Again he said, "Don't move, don't move, I won't hurt you, I just want your body." Her little girl moved and he asked whom she had in the bed with her. She told the defendant her little girl, saying: "Please don't hurt my children," to which he said: "I won't if you'll just be still." The defendant was then mauling Mrs. Black's person. Mrs. Black testified she was "scared to death". Mrs. Black feared for her children, she

testified, and began to think of how to protect them. She suggested they go into the living room to which he agreed. Thereafter, he fondled her body against her will. Mrs. Black further testified she was afraid to scream, that if she did, it would awake her children and complicate matters for them, maybe result in the death of all of them. Finally, the defendant pushed her over on the divan, pulled off her pajama pants, and against her resistance raped her. She said she was frantic but afraid to cry out lest he choke her to death and awaken her children and do violence to them. It was so dark Mrs. Black could not identify the defendant. After the defendant left, Mrs. Black called the Sutherlins, her neighbors, who immediately came over and she told them of the incident. But, it being so dark both in the house and outside, she could not see her assailant well enough for identification, nevertheless she reported the assault to the police who made an investigation. Both Mr. and Mrs. Sutherlin testified Mrs. Black was in a state of shock.

On the following Thursday night, a man with the same voice called on the telephone and talked to Mrs. Black about coming out and getting her forgiveness. She warned him if he did she would call the police. In about five minutes thereafter, someone knocked at the front door. She did not answer but went to the telephone. She heard the party leave the porch and saw him, from her kitchen window, drive away in a car.

Again, on Friday night about 12:30 A.M., Mrs. Black, Mrs. Sutherlin, and Mr. Sutherlin, who worked from 4:00 P.M. to 12:00 P.M., were visiting in her living room. Mrs. Black and Mrs. Sutherlin had been together from 8:00 P.M. to 12:00 P.M. seeking one another's comfort and security against this unknown intruder until Mr. Sutherlin returned from his work. The telephone rang and it was the voice of the unknown, whom Mrs. Black identified as such, whereupon Mr. Sutherlin told her to keep him on the telephone as long as she

could. She did for perhaps 30 minutes or longer while talking to the defendant who identified himself as that " * * * pest who broke into your house the other night." The conversation suddenly ended when someone jerked open what sounded like a telephone booth door. Mr. Sutherlin, who worked for the telephone company, according to the record had traced the call to a not too distant telephone booth from Mrs. Black's home and the defendant was arrested by the police while conversing with Mrs. Black.

The sheriff's office talked to the defendant, after he was advised of his constitutional rights, and the defendant admitted relations with Mrs. Black on the night in question. In his testimony in his own behalf, he admitted his intrusion without permission, but contended he was only making a social call and that Mrs. Black did not resist but returned his advances and entered permissibly into the act of intercourse.

The preposterous nature of this defense was made apparent on cross-examination. The defendant, while contending as he did that it was just an ordinary social call with her, never removed his clothes, shoes, or heavy jacket. The defendant admitted calling her up several times after the alleged rape, but was unable to make contact with her until Thursday and Friday nights. He admitted calling her and going to her home Thursday night notwithstanding she told him not to come that she would call the police. He said he went to her home but was unable to arouse anyone on Thursday so he left. The defendant admitted his identity as the one arrested in the telephone booth. On the occasions in question, Mrs. Black said the defendant was drinking. He voluntarily admitted from the witness stand that he was awaiting trial in Seminole County on a charge of drunk driving. These facts presented a question for the jury. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479.

■ The record discloses the defendant had a fair and impartial trial and the verdict, judgment and sentence are supported by the evidence. The defendant, in our opinion, is exceedingly fortunate to escape with the minimum sentence of 15 years for first degree rape.

The judgment and sentence is affirmed.

JONES, P. J., and POWELL, J., concur.