John Richard RHINE, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12611.

Criminal Court of Appeals of Oklahoma.

Dec. 3, 1958.

Rehearing Denied March 18, 1959.

BRETT, Presiding Judge.

Plaintiff in error Dr. John Richard Rhine, a licensed physician, defendant below, was charged by information in the District Court of Tulsa County, Oklahoma, with the crime of rape in the second degree, allegedly committed against Flora Jo Moore, a married woman, on or about July 27, 1956. The defendant was tried by a jury, convicted, his punishment fixed at two years in the state penitentiary. Judgment and sentence were entered accordingly, from which this appeal has been perfected.

Dr. Rhine was charged in the information with the second degree rape of Mrs. Flora Jo Moore, overpowering her will by intravenous injections of an intoxicating narcotic and anesthetic agent which left her dazed and without power of resistance. In support thereof, the state's first witness, Mrs. Landrith Jordan, testified that she acted as Dr. Rhine's unregistered nurse for about two years, after he took over a Dr. Devine's practice, for whom she had acted in like capacity prior thereto. She testified that Dr. Rhine always had nembutal in each of his examination rooms; that while she gave intramuscular shots, Dr. Rhine gave the intravenous shots; that he frequently gave the nembutal shots to female patients but never to male patients; that she was acquainted with Mrs. Flora Jo Moore, a patient of Dr. Rhine, and she also was acquainted with Mrs. June Coffey, Mrs. M. T. Chrysler, and Mrs. John Flies, whom she had met in like capacity; that she had seen the Doctor give nembutal shots to women on several occasions. She remembered Mrs. Flies being in the office on two occasions; she remembered that when Mrs. Flies came into the office about closing time that the Doctor and Mrs. Flies were alone in the office, Alice Moore, the receptionist, having preceded her in leaving. She said Alice Moore, before her departure, was told by the Doctor to tell Mr. Flies to leave and take the children home. Mrs. Jordan stated that on numerous occasions she had put nembutal in his medical bag for his use in making

W. C. Henneberry, Robert L. Wheeler, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam N. Lattimore, Asst. Atty. Gen., for defendant in error.

home calls. She stated Mrs. Flora Jo Moore came in late one evening but she never came back after that occasion. She also recalled Mrs. Chrysler was a patient of Dr. Rhine and he made a house call on her. She never knew that Mrs. Coffey was a house patient of Dr. Rhine.

The complainant, a woman without children, testified that the unusual attack by Dr. Rhine upon her occurred on July 27, 1956. She related that on the day in question she had gone to the Doctor's office for treatment for a severe sinus headache. She had arranged an appointment for five o'clock in the afternoon and was accompanied by her husband. Upon their arrival, the Doctor gave her a shot that relaxed her and relieved her headache. Then, she got up and almost fell. The Doctor told the nurse to put her back on the table and then to fix two cc's of nembutal which he gave her in the vein. She related it left her weak, she had no strength, could not walk, and was so weak her husband carried her from the office to the car and then took her home. She slept until seven or eight o'clock when it was beginning to get dark. She fell asleep again and her husband awakened her and said the Doctor was coming over. The weather was quite hot, but they had a water cooled air conditioner which made the room very cool. When the Doctor arrived, he suggested he would call in a prescription to a drug store. The record shows this drug store was so far away that it took Mr. Moore thirty five or forty minutes to go there and return, although there were other nearer drug stores in the vicinity. Just before her husband left, the Doctor said he would give her another shot so she could rest, which he did in the vein in the center of her right arm. The effect was the same as the shot he had previously given her in his office. She became weaker and was just barely able to maintain consciousness. The Doctor pulled a chair up to the bed and kept rubbing her arm. Momentarily, she became completely unconscious. When she awoke, the Doctor was disrobed, moved her on her back,

got in bed with her, and had intercourse with her. She related although she was conscious of all that went on, she had no power of resistance. She stated she was both scared and paralyzed. The Doctor then took his clothes and went to the bathroom, she said. The record discloses when Mr. Moore returned from the drug store, the Doctor had his shirt off and was on the back porch with the screen latched, sweating profusely. The next day after the attack, the Doctor called and asked her if she had had any nightmares. She told the Doctor he knew "what happened just as well as I do." The Doctor replied, "Well, Jo, you know I wouldn't do anything like that to you."

Mrs. Moore did not report the attack to her husband until sometime in July, 1957. She never went back to Dr. Rhine for treatment, but her husband did during the interim of a year. Mr. Moore corroborated her testimony concerning the details in which he figured, especially as to going for the prescription and returning to find the Doctor partially disrobed.

The state also offered the testimony of Mrs. June Coffey, a divorcee, the mother of two young sons, five and eleven years of age. She related she had known Dr. Rhine for about two years. He had treated her for colds and lung trouble. She was attended both in the Doctor's office and at her home. The Doctor gave her shots both in the muscle and in the vein. The last time she was attended by the defendant was on January 29 or 30, 1957. She was ill and had tried to get Dr. Rhine all day. About 11:00 p. m., she said, he called stating if needed, he would come out then. He came shortly thereafter and seeing the two little boys with her, sent them to bed. The Doctor gave her a shot of adrenalin for her asthma, then told her she should be knocked out so she could get plenty of rest. He then gave her a shot in the vein. She fell asleep, she said, and when she awoke, he was on top of her, having intercourse with her. She was lifeless, she said. When she awoke, her pajama pants had been removed, her Ko-

tex, her period being on, lay on the floor, and a bloody man's handkerchief was beside her bed. The first thing she did was to call her priest, she asserted. She said she objected to being treated that way. It is apparent she did so in calling her priest and in calling the matter to the county attorney's attention.

Mrs. Norma Chrysler, married, the mother of two little girls ages sixteen months and three and one-half years, was called by the state. She testified that Dr. Rhine had been treating her for a kidney infection and other ailments since about November, 1955. In October, 1956, the Doctor was called, she having a high fever. Dr. Rhine answered about 9:00 a. m. He examined her, she said, and believing it was a nasal infection, sent her husband to the prescription shop to get a nasal spray. Before her husband left, she related, the Doctor gave her a shot in the vein and also one in the hip. The vein shot made her sleepy and light headed and weak. She said, "I couldn't move my limbs like you might want to." "As soon as my husband left he came to the bed and made improper advances." He put his hands on her breast and below, too, she related. The trial court rejected the state's offer to show that at a later time she accused the Doctor of the improper advances, and to prove what was said. She made two visits subsequent to this incident to the Doctor, one the day after this incident and another the day after that. On these visits it appears she only saw the nurse. She told her husband about the immoral proposal after the second visit to his office, but has not been back since.

Mrs. John Flies, twenty three years of age, was the next witness for the state. She stated she was the mother of three children of the ages of three, five, and six years. She was a patient of Doctor Rhine, having been in a wreck and being unable to open her jaw. She testified that on July 3, 1956, she went to the Doctor's office accompanied by her husband and the children. The Doctor said this treatment would take some time and sent Mr. Flies home with the children. It was late in the day and the nurse had apparently left because Mrs. Flies never saw her after she prepared her for examination on the table in the examining room. No one else was there after that but she and the Doctor. The Doctor came into the room and said he was going to give her a little shot in the vein. She lost her sense of feeling, "just felt numb." The Doctor waited until she "didn't want to move," then he removed her pants, took an instrument off the wall, and used it on her private parts. Then, he started rubbing over her private parts with his hand. He got upon the table over her, and then said, "Wait a minute." He got off, gave her another shot in the vein, which made her feel the same way as the first shot. Then, he got on her and had intercourse with her. She was aware he was kissing her and having intercourse with her. She said she did not push the Doctor away because she could not move very well. He put her pants back on and called her husband and told him to come and get her. He gave her another shot and said it would bring her to. She then got up and dressed. She testified the Doctor never took time to examine her jaw. Just before her husband arrived, the Doctor unlocked the door. She walked to the car with the aid of her husband. She slept all day the next day and related the incident to her husband five days later. They immediately reported the matter to their priest. Mr. Flies corroborated the details to which her testimony indicated he was a party.

Dr. William Walker, Dr. William O'Melia, Dr. John G. Matt, and Dr. H. B. Stewart testified for the state as to the effects of nembutal or sodium pentobarbitol. They related, in substance, they were one and the same in effect and were used as an analgesic and also as a sleep producing drug, as well as a complete anesthesia. Dr. Walker testified it could be administered either orally or intravenously. He said its effects intravenously were more immediate and also more fleeting than when administered orally. The stages depending upon the quantity of the dosage run from mild drowsiness to complete hypno-

sis or complete anesthesia. The speed of the reaction and the recovery would vary in persons. He testified his experience had been that the person injected with nembutal would not have dreams, deliriums or hallucinations. In short, the effects, depending on the dosage and the person's reaction, could produce mild sedation, deep sleep, or coma. He said there was an area at which a person could be in such a state, by means of sodium pentobarbitol, that he would be able to recognize everything that was going on at a particular time, and still be under the influence of the drug. He testified by practice and study of the patient's reactions, one could become efficient in knowing when to stop and when to give more to get the result desired.

It is well to point out that Dr. H. B. Stewart, Chief Anesthesiologist at St. John's Hospital in Tulsa, qualified as an outstanding authority in that field. He said nembutal produces a condition when injected intravenously anywhere from light sedation through a period of semiconsciousness to a state of complete unconsciousness or hypnosis. He said there was an area in which the patient would be enfeebled to the point of inability to move, and yet he could remember some of the things that happened to him.

The defendant moved to strike the testimony of state's witnesses Mrs. Coffey, Mrs. Chrysler, and Mrs. Flies for the reason those alleged attacks were too remote in point of time and therefore there was no feasable connection with the incidents charged in the information and constituted grounds for mistrial. The trial court overruled the motion. Demurrer was then interposed to the sufficiency of the evidence and overruled by the trial court.

The defendant testified in his own behalf, denying positively he had intercourse with the complainant and supporting witnesses. He did not deny that he made the home calls or saw the patients in his office who testified for the state, or that he gave them shots of nembutal to relax

them. He did not deny that he saw Mrs. Moore both in his office and later at her home, or that he sent her husband to the prescription shop for medicine. Neither did he deny he gave her nembutal at his office and later at her home, nor that he used the drug in his practice as a sedative from treating nasal sinus conditions to preparing patients for surgical procedure, on both male and female patients. The Doctor admitted although the Butler Drug Store was much closer to the Moore residence than the Cunningham Store, he called the prescription for Mrs. Moore to Cunningham's. He admitted he did not call Butler's to see if they could fill the prescription. Dr. Rhine testified he did not agree with the claims of Abbott Laboratories, contained in their directive pamphlet that "when administered intravenously, it takes effect almost instantly and produces all degrees of cerebral depression from sedation to complete anesthesia, depending upon the size of the dose." He said, " * * the reason it is given—one reason I give it intravenously, you measure your dose and know where your patient is, rather than give a large oral dose—." The effect of his answer to questioning was, finally, that you can thus measure the effect of the drug in so far as their reaction to it, until you can take them all the way down to where they are in a deep coma. Hence, there was little difference in his testimony and the claim of the producing laboratory as to the effect of nembutal. Dr. Rhine positively denied having intercourse with Mrs. Moore, Mrs. Coffey, and Mrs. Flies. He denied giving Mrs. Chrysler nembutal, but did admit he gave her a drug to relax her muscles, but stated no barbiturates were administered to her. He denied making improper advances to her.

The defendant offered the testimony of Dr. Robert E. Funk, who, in testifying in response to the inquiry, "Is there any degree of sedation where a person loses partial control of his physical movement?", "It isn't that he loses control—of course he loses control but it is that he loses his

central nervous system control and of course, it progresses slowly naturally and the first thing that he appears to lose is memory, and I don't think you even have to have hypnosis to make them lose memory." He said they lose their equilibrium without being fully, completely asleep. He disagreed with Dr. Paul Adrian, Director of the Department of Anesthesiology at Tulane University, when he said in his book on the use of sodium pentobarbitol, it was "to steel patients who are uncooperative, apprehensive, and excitable, * * *." This bears marked similarity to Dr. Rhine's disagreement with the claims of Abbott Laboratories concerning the effect of nembutal. When Doctors get themselves in opposition to producers and authorities on the effect of drugs, it surrounds their conclusion with the shadow of doubt as to its validity.

Dr. William L. Morgan being called for the defendant, testified sodium pentobarbitol is used for "pre-operative medication to be given to the patient prior to coming to surgery. Occasionally it is used in the surgical anesthesia itself." In substance he related that when used intravenously, sodium pentobarbitol can produce all degrees of sedation from mild sedation to deep coma. He related that Dr. Stewart, hereinbefore referred to as state's witness, was an authority in his field of anesthesiology.

Dr. A. N. Taylor, Professor of Physiology at the University of Oklahoma Medical School, testified the defendant had a good reputation while a student at the medical school.

Dr. Arthur Hellbaum, Professor of Pharmacology at the University of Oklahoma Medical School, testified that sodium pentobarbitol was a depressant of the brain and spinal cord, which, of course, have their influence over the muscles of the body. With it, he stated, one can get varying degrees of depression to the point of complete anesthetic level. In its effects, under normal conditions, if one was unable to move, he would have no recollection of what occurred. He testified that any drug may be misused or not used judiciously if so desired by an unscrupulous individual. He said barbiturates have different effects on different people. He said while sodium pentobarbitol will produce different degrees of depression from mild sedation to deep coma, the effects upon this woman or that woman would vary, depending upon the amount given and how it was given.

In rebuttal, Mrs. Holleman, Mr. and Mrs. Moore's landlady, testified contrary to Dr. Rhine that she did not let him in the front door. She testified that the Doctor came in the back door with Mr. Moore and left the same way. She related the Moores could use the front door, but they never did. She testified that contrary to Dr. Rhine's testimony that it was quite hot in the Moores' apartment (explaining, so the Doctor said, why he had his shirt off when Mr. Moore returned) that it was cool therein, she having been in the apartment before Dr. Rhine arrived. Further, she testified the water cooled air conditioner in the apartment was on, whereas he said it was not.

■ On this evidence, a sharp conflict confronted the jury. It was their sole province to weigh and consider the evidence where the same was conflicting. Where there is sufficient evidence reasonably tending to support the jury's finding, the same will not be reversed. McKinnon v. State, Okl.Cr., 299 P.2d 535; Stevens v. State, Okl.Cr., 302 P.2d 491.

■ The defendant asserts that the information was wholly insufficient to charge first degree rape, the crime first alleged in the information. The record discloses that thereafter the state obtained leave to file an amended information charging second degree rape, to which there was no pleading filed and to which the defendant entered his plea of not guilty and on which he was tried. If any objections were available to the accused on the amended information, it is fundamental that he waived them by failure to assert the same.

█ The principal contention of the defendant herein is that the trial court erred in permitting the testimony of Mrs. Coffey, Mrs. Chrysler, and Mrs. Flies as to other similar offenses to be received in evidence. This Court has repeatedly held in numerous cases that that general rule on this type of evidence is:

"When a defendant is put on trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone and evidence which in any manner shows or tends to show that he committed another crime wholly independent, even though it be a crime of the same sort, is irrelevant and inadmissible."

Landon v. State, 77 Okl.Cr. 190, 140 P.2d 242; Hall v. State, 67 Okl.Cr. 330, 93 P. 2d 1107; Miller v. State, 49 Okl.Cr. 133, 295 P. 403; Quinn v. State, 54 Okl.Cr. 179, 16 P.2d 591; rape cases. Bunn v. State, 85 Okl.Cr. 14, 184 P.2d 621; exhibitionist. Harris v. State, 88 Okl.Cr. 422, 204 P.2d 305, 8 A.L.R.2d 1006; attempted rape. There can be no question but that ordinarily such should be the rule, and should be generally followed in ordinary cases. But, to the foregoing rule there are many exceptions, among which is:

"An exception to the rule of evidence that evidence of other offenses cannot be introduced to establish the commission of the offense charged arises where the other offense or offenses tend to identify the accused with the offense charged; or where such testimony is for the purpose of showing that the offense charged was a part of a system or common scheme or plan, including other like offenses; or where proof of a separate offense is explanatory of the motive or intent of the offender in the commission of the crime charged."

Thacker v. State, 55 Okl.Cr. 161, 26 P.2d 770, 774, an abortion case. In the opinion, the Court further said:

"The admission of this testimony, as stated by the court, was for the purpose only of showing the custom, schemes or plans, if any existed, or the unlawful intent or motive, or to explain a particular course of action, and the court specifically advised the jury that if it did not find such evidence as may have been admitted tending to connect the defendant with the crime, then it was its duty to disregard the same."

The purpose of the state in proving the acts committed against the three other persons hereinbefore named was identical with that in the Thacker case, and the trial court's instruction number six herein was identical with the one given in the Thacker case. The foregoing cases relied upon by the defendant correctly state the law but are distinguishable on the facts. This case, as found by the jury, presents a factual situation most unusual, involving a brash modus operandi characterized by impudent cunning, complete depravity, and a total disregard of the ethical concepts of the high calling of medicine. Each of the separate acts hereinbefore delineated bear marked similarity one to the other as to clearly define a particular course of action, custom, design, scheme and plan, each combined with the same unlawful intent or motive tending to connect the defendant with the crime of the rape of Mrs. Moore. In Dunscombe v. State, 19 Okl.Cr. 45, 197 P. 1073, 1077, in considering the admissibility of other allegations of immoral conduct of a similar nature between the defendant and three other women, committed in his office ranging in occurrence from nine to fifteen months apart (which was held erroneously admitted only because it was offered in rebuttal) said:

"The authorities are divided on the question of whether evidence of other acts of alleged misconduct of a similar nature is admissible in a case of this kind for the purpose of proving intent. The better reasoned authorities, in our opinion, are to the effect that such evidence is admissible for that purpose *with proper limitation* as to

the time of such occurrences, in order to avoid the objection that defendant has been unfairly surprised." (Emphasis supplied.)

Thus, this Court indicated ' its willingness in a proper case to follow the now well recognized exception. A few other cases to illustrate its application will suffice.

In Commonwealth v. Kline, 361 Pa. 434, 65 A.2d 348, at page 351, quoting from Commonwealth v. Winter, 289 Pa. 284, 137 A. 261, 263, it was said:

"That evidence of the commission of other similar crimes may be given to show the *plan* or *design* on the part of the defendant to commit such crimes has often been judicially recognized. The word 'design' implies a plan formed in the mind. That an individual who commits or attempts to commit abnormal sex offenses is likely to have such a mental 'plan' finds recognition in the fact that when a defendant is charged with the commission of sexual offense the law is more liberal in admitting as proof of his guilt evidence of similar sexual offenses committed by him than it is in admitting evidence of similar offenses when a defendant is charged with the commission of non-sexual crimes. The fact that A, who is being tried for the murder of Y, was one time convicted of murdering X, has no probative value to prove A guilty of murdering Y, if the two murders were in no way related. On the other hand, if A is being tried for the rape or attempted rape of Y the fact that recently he raped or attempted to rape X is admissible in evidence because it tends to prove that he possessed such an abnormal mental or moral nature as would likely lead him to commit the offense charged. 'Human nature constitutes a part of the evidence in every case. We more easily believe that a person has done what we would have expected under the circumstances, and we require a greater degree of evidence to satisfy us that a person has done something which would be unnatural or improbable.' Greene v. Harris, 11 R.I. 5, 7."

In People v. Cassandras, 83 Cal.2d 272, 188 P.2d 546, 551, that Court said:

"But where the prior rape or attempt is committed under circumstances remarkably similar to the one charged the evidence is admissible to show a plan or scheme to commit the crime in that fashion, even though the prior rape or attempt was committed on a person other than the prosecutrix. In such cases the evidence that defendant committed the prior offense tends to prove that he committed the offense charged. A case quite similar to the instant one is People v. Cosby, 137 Cal. App. 332, 31 P.2d 218. There the defendant was charged with assault with intent to commit rape. The prosecutrix testified that she had placed an advertisement in a newspaper to secure work; that appellant telephoned her and asked her to call; that when she called he invited her to his room so that he could secure her references; that when she entered his room he attempted to rape her. It was held that evidence that on two prior occasions he had lured other women to his apartment under similar circumstances and attempted to ravish them was admissible. The court, after stating the general rule that such evidence is normally not admissible, declared that an exception to that rule was 'that where several crimes are committed as part of one scheme or plan, all of the same general character, tending to the same common end, they may be given in evidence to show the process or motive and design leading up to the particular crime for which the prisoner is being tried, as tending to show logically that the crime in question was part of such common scheme.' 137 Cal. App. at page 335, 131 P.2d at page 220. The same rule was applied in a rape case in People v. Branch, 77 Cal. App. 384, 246 P. 811."

But, the Court took pains to point out that in rape cases evidence of other crimes committed on other persons is generally not admissible, but only in unusual cases bearing a similarity of characteristic design.

In State v. Jenks, 126 Kan. 493, 268 P. 850, 851, in holding such evidence admissible, the Kansas Supreme Court said:

" 'While the general rule is that one crime cannot be established by proof of other independent crimes, there are well-recognized exceptions to the rule, and one of them is that in sexual offenses proof of prior and subsequent acts of intercourse are admissible to show the lustful disposition, the existence and continuance of the illicit relation, as these tend to explain the act charged and corroborate other testimony of the prosecution. The exception has been so frequently and thoroughly considered that there is no occasion for further consideration or comment.' State v. Stitz, 111 Kan. 275, 206 P. 910.

"Defendant insists that the rule cannot apply to cases where the victims of defendant's lust are others than the one upon whom the rape charge was committed. In State v. Bisagno, 121 Kan. 186, 246 P. 1001, where defendant was charged with statutory rape with an infant, testimony that he had committed a like offense upon another girl about the same time was received, and it was held upon appeal that it was admissible to show a lustful disposition of the defendant and thus supplement and corroborate other evidence that he had committed the offense charged."

State v. Funk, 154 Kan. 300, 118 P.2d 562; State v. Allen, 163 Kan. 374, 183 P.2d 458; State v. Whiting, 173 Kan. 711, 252 P.2d 884; Taylor v. State, 55 Ariz. 13, 97 P.2d 543, 545. In Taylor v. State, supra, the Arizona Supreme Court held:

"There is no question but that the general rule is 'that, in the prosecution of one accused of a particular offense, evidence * * * of another crime entirely distinct and independent of that for which he is on trial, even though it be a crime of the same class, is neither relevant nor admissible.' Dorsey v. State, 25 Ariz. 139, 213 P. 1011, 1012. However, there are several exceptions to this rule and one of them is those cases in which the evidence of similar offenses tends to show a system, plan or scheme embracing the commission of two or more crimes so related to each other that the proof of one tends to establish the other, Vigil v. State, 33 Ariz. 51, 262 P. 14; Cummings v. State, 20 Ariz. 176, 178 P. 776, and the state contends that the facts of this case bring it clearly within this exception. It occurs to us that this position is sound, for in the case of rape, either statutory or forcible, evidence of similar offenses which shows that in the commission of the offense the accused used a system or plan, tends just as much to establish the act charged, as does the evidence of similar acts in the case of any other crime. State v. Jenks, 126 Kan. 493, 268 P. 850; Merritt v. State, 168 Ga. 753, 149 S.E. 46; People v. Cosby, 137 Cal.App. 332, 31 P.2d 218; Suber v. State, 176 Ga. 525, 168 S.E. 585; State v. Hammock, 18 Idaho 424, 110 P. 169."

By the same token, the defendant's peculiar method of operation in this and his other similar acts discloses a distinct scheme for the satisfaction of his lust, each of the acts being of the same general character, evidence thereof establishes beyond reasonable doubt what was part of a common plan and tends to prove the offense committed against Mrs. Moore. The logic of such rule in cases of this kind is forcibly illustrated by the facts of the case at bar. It is thus apparent that the case at bar constitutes an exception to the general rule of inadmissibility of evidence of other offenses. If the law is to provide protection intended, we dare not hold otherwise.

To hold otherwise might open the door for creation of a medical jungle whereby an unscrupulous practitioner could satisfy his passions upon the unsuspecting invalid and ill female members of society with impunity. This he could do as in the case at bar by intravenous injections of drugs dulling the senses, paralyzing the body, and overpowering the will to resist. No more treacherous, contemptible, criminal cunning could be displayed than in this design, plan or scheme as an instrument for violating the sacred virtue of womanhood established by the facts of this case, and believed by the jury as evidenced by their verdict. The furtive invasion of one's fireside by a thief in the night is an act of virtue when measured by this lecherous scheme to despoil the social standing of these good women. Each of these witnesses confidently placed themselves in the hands of him who wore the badge of his honorable profession, believing they could trust him and that his medication would ease their pains, soothe their anxieties, and enure to their benefit and not result in abuse of their bodies, much less an unsolicited invasion of their sacred virtue. Only because these women were possessed of rare courage expressing a guardianship for others to be protected by their civic consciousness were these abasing acts made known in this public prosecution. Possibly too, only because two of them reported the assaults made upon them to their priests was the public prosecutor appraised of them. The ordinary person would have followed the line of least resistance, and knowledge of the unsolicited assault would have died with them, while the perpetrator of the crime continued to give vent to his lust unrestrained by law. He who protects himself yields only to the first law of nature, self preservation, but he who protects others lays himself upon the altar of knightly honor in a tribute of self sacrifice. The scars of disclosure of this unwarranted injury sustained by these good women are deserving of the highest recognition. They should be acclaimed, not avoided and shunned. This paragraph is pure dicta, not essential to decision in the case, but is a hymn of praise to those unsung heroines who shall forever be shunned by some because they dared to do that justice might be achieved.

■ The defendant's second contention is that the trial court erred in failing to give his requested instruction number three to the effect that in connection with determining whether or not the testimony of the prosecutrix is clear and convincing so as to eliminate the need of corroborative evidence, the jury may take into its consideration the length of time between the alleged rape and complaint thereof by the prosecutrix. Woolridge v. State, 97 Okl. Cr. 326, 263 P.2d 196. While the court commented in that case upon the delay of five months in complaining about the assault, it certainly does not stand for the proposition that the trial court should place special emphasis upon that particular feature of the case. To the contrary, it has been held error for the trial court so to do. Wingfield v. State, 89 Okl.Cr. 45, 205 P.2d 320; Turpen v. State, 89 Okl.Cr. 6, 204 P.2d 298; Richerson v. State, 43 Okl.Cr. 293, 278 P. 356; Stout v. United States, 10 Cir., 227 F. 799. The defendant was entitled to a general instruction on the credibility of the witnesses, Carter v. State, 35 Okl.Cr. 421, 250 P. 807, which was covered by the trial court's instruction number twelve. It would have been improper to give the defendant's requested instruction number three.

■ The defendant likewise complains the trial court erred in not giving his requested instruction number five, covering evidence of other offenses. That feature of the case was adequately covered by the trial court's instruction number six in which this evidence was limited in keeping with the foregoing authorities under defendant's proposition one. State v. Martinez, 67 Ariz. 389, 198 P.2d 115.

■ The defendant's requested instruction number six dealing with the proposition of rape by force overcoming the resistance of the complainant is not appli-

cable under the facts and refusal to give the same was not error.

■ The defendant claims the trial court erred in not giving his requested instruction number seven, which was likewise not applicable since it dealt with the proposition of the administration of a drug by the defendant to his victim designed to excite her passions. There is no contention that the drug employed, nembutal, excited the passions. The evidence established it was paralyzing and hypnotic in its effects in varying degrees to the point of unconsciousness. It is therefore apparent this instruction introduces an element entirely outside the issues involved in the case, and it was not error to refuse to so instruct.

■ The defendant's third proposition relates to the sufficiency of the evidence, particularly as applied to Mrs. Moore's delay of nearly a year in making complaint, during all the while her husband was availing himself of Dr. Rhine's services. The testimony of Mrs. Jordan was to the effect that Mrs. Moore was never in the Doctor's office after the afternoon of the day the assault was committed, even though she knew her husband was using Dr. Rhine's services. These facts give credence to her statement that she was afraid what her husband might do, so she kept her secret deeply buried within her own knowledge, but she had nothing to do with Dr. Rhine after the assault. This fact alone does not render her story contradictory, uncertain, or improbable, since the doctrine appears to be that delays, of whatever duration, may only weaken the effect of the victim's evidence with the jury. Particularly is this true where her story is corroborated in essential details by competent evidence and confirmed by the peculiar similarity in significant respects of other offenses committed by the defendant which show that in the commission of the offense charged, the accused used a system or plan which tends to establish the act charged and connect him therewith. People v. Sullivan, 101 Cal.App.2d 322, 225 P. 2d 645, and cases therein cited. Especially is this rule correct when the evidence of other crimes is limited by the trial court's instructions to such purposes of plan, scheme, and particular course of action. Thacker v. State, supra. The evidence was entirely sufficient to sustain the jury's finding and it was their sole province to weigh and determine the facts and the credibility of the witness. Moreover, it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, yet it is equally well settled that the appellate court will scrutinize the testimony upon which the conviction was obtained, but unless it appear incredible or too unsubstantial to make it the basis of a judgment, the conviction will be sustained. Hutchinson v. State, Okl.Cr., 278 P.2d 858.

For all the foregoing reasons, the judgment and sentence is accordingly affirmed.

POWELL and NIX, JJ., concur.

### On Rehearing

PER CURIAM.

On petition for rehearing, plaintiff in error vigorously contends the Court failed to take proper cognizance of the majority rule in this type case in regard to the admission of evidence of other offenses by plaintiff in error. It is conceded that the principle controlling the opinion in this case is a departure from the general rule. In fact, it is an exception to the rule dictated by the necessities of the situation with which we are confronted. The law is presumed to be a shield of protection to the people, and not a refuge of rascality for him who commits a series of sex offenses, characterized by an abnormal design, plan or scheme of accomplishment, predicated upon a cunning breach of the highest professional trust and confidence, that between a doctor and his patient. In such cases, evidence is admissible of prior or subsequent offenses as part of the design, scheme or plan, bearing a peculiar mark of operation or accomplishment. The petition for rehearing is accordingly denied, and the mandate is ordered issued, forthwith.

NIX, J., dissents.